**MOBILE MEDICAL INTERNATIONAL CORPORATION, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 10–148C.

United States Court of Federal Claims.

Filed: Aug. 31, 2010.

Redacted Version Issued for Publication: Nov. 16, 2010.[1]

1. This opinion was issued under seal on August 31, 2010. The parties were asked to propose redactions prior to public release of the opinion. The parties proposed joint redactions, and each party also proposed additional, different redactions, to which the other party objected. Each party vigorously debated their respective positions. After review by the court, this opinion is issued with redactions determined appropriate. Where words or numbers have been redacted, it is reflected in the text of the opinion with the word "[deleted]."

Blair Andrews, Kilpatrick Stockton LLP, Atlanta, GA, for the plaintiff. With her were Reginald Williamson and Michael Tyler, Kilpatrick Stockton LLP, Atlanta, GA.

James Sweet, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the defendant. With him were Jeanne E. Davidson, Director, and Tony West, Assistant Attorney General, Civil Division. Of counsel, Barton B. Evans, Houston Office of Regional Counsel, Department of Veterans Affairs, Houston, TX.

## OPINION

HORN, Judge.

### FINDINGS OF FACT

This case involves a post-award bid protest filed with the court by Mobile Medical International Corporation (MMIC).[2] MMIC's protest arises from the award of a task order to Gerling & Associates (Gerling), through the General Services Administration (GSA) Federal Supply Schedule (FSS). Plaintiff alleges impropriety by the Department of Veterans Affairs, Southeast Louisiana Veterans Health Care Systems (the Agency) when the Agency procured mobile medical units through the GSA FSS. Plaintiff MMIC brings claims against the Agency for alleged violations of the federal Procurement Integrity Act, 41 U.S.C. § 423 (2006) (Count I of the complaint); the federal Trade Secrets Act, 18 U.S.C. § 1905 (2006) (Count II); for arbitrary and capricious Agency action based on the misuse of the GSA FSS (Count III); for arbitrary and capricious GSA action in accepting a modification to a GSA FSS 23 Vehicle Multiple Award Schedule contract (the GSA schedule contract) (Count IV); and for the uncompensated taking of proprietary information (Count V). MMIC seeks preliminary and permanent injunctive relief, monetary damages, and a declaratory judgment.

As a result of Hurricane Katrina, the New Orleans Veterans Affairs Medical Clinic in New Orleans, Louisiana was devastated and the healthcare system in New Orleans became fragmented. The Agency contacted MMIC about acquiring mobile medical trailers in an effort to ensure continuity of care, while awaiting repair of the clinic. On January 5, 2009, the Agency emailed MMIC, asking for cost information about "different types of mobile medical trailers," and requested that the information be provided no later than January 7, 2009. MMIC responded to the Agency's request on January 7, 2009, via email, with an attached Budgetary Proposal. The email from plaintiff contained an automatically generated confidentiality stamp which provided that:

> This e-mail and any attachments are for the sole use of the intended recipient(s) and may contain technical data within the definition of the International Traffic and Arms laws and regulations of the U.S. This e-mail and any attachments are confidential and may contain confidential, proprietary Mobile Medical International Corporation Information. If you are not the above named recipient, or the employee or agent responsible to deliver this e-mail to the intended recipient, you are hereby notified that any use, disclosure, printing, copying, or distribution of the e-mail or its attachments is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by tele-

---

**2.** MMIC is a Department of Veterans Affairs (VA) vendor which has leased mobile surgical units to various Veterans Administration Medical Centers on four previous occasions: Solicitation Nos. VA245–P–0159, VA256–P–0727, and VA248–P–1244, and Purchase Order 405C70391, a sole source procurement.

phone or by reply e-mail and destroy this e-mail and any attachments.

MMIC's Budgetary Proposal included a drawing of Mobile Medical's Mobile Surgery Unit,™ [3] a list of "Integrated Equipment" and a Justification for Sole Source Procurement. The drawing of the Mobile Surgery Unit ™ included a legend providing that: "THE MATERIAL AND INFORMATION CONTAINED HEREIN IS CONFIDENTIAL AND IS THE PROPERTY OF MOBILE MEDICAL INTERNATIONAL CORP. AND IS NOT TO BE USED, DISCLOSED, COPIED, TRANSFERRED OR REPRODUCED WITHOUT THE PRIOR WRITTEN PERMISSION OF MOBILE MEDICAL." (capitalization in original).

The list of "Integrated Equipment" set forth the custom designed and commercially available equipment used in MMIC's mobile medical units, including a brief description, the model, and the manufacturer of each type of equipment, but noted that brands and models could be substituted with equivalents without notice.[4] In its Justification for Sole Source Procurement, MMIC asserted that, to its knowledge, no other manufacturer in the United States was qualified to produce Joint Commission on Accreditation of Healthcare Organizations (JCAHO) and Medicare approved mobile surgical units.

The Agency used MMIC's proposal when it requested funding for medical mobile units and gave MMIC a Statement of Work (SOW) for six mobile trailers on May 19, 2009. On May 21, 2009, the Chief of Purchasing and Contracting for the Agency posted a Sources Sought Notification on the FedBizOpps website, FBO VA–256–09–RP–0236. The posting indicated that the Agency intended to negotiate a sole source contract for six mobile medical units with MMIC, but that it would evaluate proposals from other interested companies, with the condition that whether to compete the proposed procurement was within the sole discretion of the government. Seven companies expressed an interest in the procurement, two of which expressly contradicted the notion that MMIC was the sole provider of the required mobile medical units, and all of which implicitly or expressly claimed to be able to provide the type of mobile surgical units that the Agency sought.[5]

After the Sources Sought Notification posting, the Agency obtained the results of a responsibility check on MMIC from Dun & Bradstreet, as required by VA policy. According to the contracting officer, the responsibility check predicts the "likelihood that a company will obtain legal relief from creditors or cease operations without paying the creditors in full over the next 12 months." MMIC had a Dun & Bradstreet rating of [deleted] on a risk scale from 1 (lowest risk) to 9 (highest risk). According to the parties' joint stipulation of facts and a directive issued to the heads of the VA Contracting Authorities, for any contractor with a risk score of 7 or higher, the contracting officer can continue with the procurement, but must first submit additional documentation of a due diligence review to justify the award to a high-risk contractor.

To continue with the procurement process in this instance, the contracting officer submitted a request to the Veterans Integrated Service Network on June 16, 2009 to procure the mobile units through full and open competition. The Office of Small and Disadvantaged Business Utilization, however, denied

---

3. Plaintiff refers to MMIC's mobile unit as a Mobile Surgical Unit,™ but the drawing of the unit that plaintiff references identifies it as a Mobile Surgery Unit.™ To avoid confusion, the term Mobile Surgery Unit ™ is used throughout this opinion.

4. Refer to Exhibit A below for a copy of the drawing of the Mobile Surgery Unit ™ and Exhibit B for a copy of MMIC's list of "Integrated Equipment."

5. [deleted] stated that there was no need to negotiate a sole source contract with MMIC because [deleted] could provide mobile medical units equipped for surgery. [deleted] indicated that MMIC was not the sole provider of mobile medical units and that it builds mobile surgical units as well. [deleted] noted that it had vast experience providing mobile trailers for surgery. [deleted] stated that it had a long history of delivering mobile medical units of the type the Agency sought. [deleted] responded that it could meet the Agency's needs. According to the contracting officer, [deleted] and [deleted] also expressed an interest.

the request, stating that service-disabled, veteran-owned small businesses could manufacture the units. As an alternative to procuring the units from service-disabled, veteran-owned small businesses, the Office of Small and Disadvantaged Business Utilization suggested buying them through the GSA FSS. The contracting officer decided that service-disabled, veteran-owned small businesses were not capable of producing the units, and sought information about the capacity of companies on the FSS to produce the units. The contracting officer contacted her counterpart at the GSA FSS office, who informed her that the mobile units could be purchased through the "Firefighting Vehicles and Accessories" category or the "New Technologies" category of the GSA FSS.

On June 25, 2009, the contracting officer posted a Request for Information (RFI) with a draft SOW on GSA e-Buy to fifty-three vendors to determine whether FSS companies were capable of meeting the Agency's needs for the mobile surgical units. The contracting officer reported that five companies expressed an interest in the request by the July 6, 2009 deadline.[6] The contracting officer also conducted market research and determined that several companies on the GSA schedule were capable of producing the units.[7] On June 30, 2009, the contracting officer sought approval from the Veterans Integrated Service Network and the Office of Small and Disadvantaged Business Utilization to buy the mobile units through the FSS and permission was granted.

On June 30, 2009, Mark Munroe of MMIC emailed the contracting officer to inquire about the status of the procurement. The contracting officer explained that, based on the response from the Office of Small and Disadvantaged Business Utilization, the Agency could not release the solicitation for full and open competition, that it would compete the solicitation on the GSA FSS, that several FSS companies had affirmed they could provide the necessary mobile units, and that MMIC should consider "getting on that [GSA] schedule" so it could take advantage of future GSA solicitations. On July 27, 2009, MMIC replied to the contracting officer's email, stating that it had submitted its mobile surgery and mobile endoscopy units for inclusion on the GSA schedule and that, "[h]opefully, procuring the [mobile surgery units] through GSA will simplify your process and speed the acquisition for the New Orleans veterans." MMIC did not object to the use of the GSA FSS to acquire mobile medical units until the Agency issued a delivery order to Gerling on October 8, 2009.[8]

On August 18, 2009, the contracting officer posted a Request for Quote (RFQ) and a SOW on GSA e-Buy for six mobile operation and procedure room trailers. The RFQ contained a rendering of the proposed trailers, similar to that submitted by MMIC in its Budgetary Proposal.[9] According to the contracting officer, the drawing was based partly on brochures distributed by MMIC and slides from a presentation given by MMIC at an event in Florida in which plaintiff had displayed one of its Mobile Surgery Units."[10] The contracting officer stated that she also had relied on a trailer drawing from a solicitation "issued pursuant to a HubZone set-aside lease between the Martinsburg, West Virginia VA Medical Center and MMIC."

Prior to submitting the RFQ on GSA e-Buy, the contracting officer issued an amendment, Amendment 001 to the RFQ, to add a list of equipment the Agency sought for inclusion in the trailers. The list of equipment is an almost verbatim reproduction of the integrated equipment list submitted by

6. Although the contracting officer reported receiving responses from five firms, plaintiff contends that there are documented responses from only two firms, [deleted] and Gerling.

7. The firms included [deleted].

8. Plaintiff states that it did not object to using the FSS for the purpose of procuring mobile surgical trailers because it believed that no other federal contractor provided the approved trailers.

9. Refer to Exhibit C for a copy of the Agency's rendering of the proposed mobile medical trailer.

10. Refer to Exhibits D and E for copies of the drawings upon which the Agency allegedly based its rendering of the proposed mobile medical trailer.

MMIC in its Budgetary Proposal.[11] According to the contracting officer, all documentation was "scrubbed of MMIC's proprietary information."

The FSS RFQ closed on August 31, 2009. By the closing date, two firms, Gerling and [deleted], had provided quotes for the trailers. In its offer, Gerling included a list of equipment and facilities to be provided in the trailers, specifically naming the brands and types of equipment listed in the Agency's amendment to the RFQ.[12] Gerling also enclosed a drawing of its proposed mobile operating room trailer, which was dissimilar to MMIC's Mobile Surgery Unit.™ [13] *Compare* Exhibit A (MMIC's Mobile Surgery Unit ™), with Exhibit H (Gerling's mobile medical trailer). The Agency found problems with Gerling's proposed, trailer, draft layout with respect to doors and access, but Gerling informed the Agency that if it were awarded the contract, the layout could be altered to satisfy the Agency's needs and to meet all Agency required certifications.

On September 17, 2009, Gerling requested permission from the GSA to modify its GSA schedule contract by adding three types of mobile surgical trailers.[14] The GSA granted permission to modify Gerling's GSA schedule contract on September 28, 2009. Gerling had a Dun & Bradstreet score of [deleted] (with 1 being the lowest risk and 9 being the highest risk), and proposed a contract valued at $[deleted], plus $[deleted] for an extended warranty. The Agency [deleted] but ultimately awarded the task order to Gerling on October 8, 2009.

On October 26, 2009, MMIC filed a bid protest (B–402189) with the Government Accountability Office (GAO), challenging "the propriety of the VA's actions in connection with the procurement" of the mobile medical trailers. MMIC made various allegations, including that the Agency had violated procurement statutes and regulations by awarding the contract to Gerling and by disseminating MMIC's allegedly trade secret Mobile Surgery Unit ™ design layout and its proprietary list of integrated equipment. According to the complaint filed in this court, MMIC withdrew its GAO protest when it filed a complaint in this court.

## DISCUSSION

Plaintiff's complaint brings five counts before this court. In Count I of its complaint, MMIC alleges that the Agency violated the Procurement Integrity Act, 41 U.S.C. § 423, by knowingly reproducing MMIC's confidential and proprietary Mobile Surgery Unit ™ layout on page 159 of its RFQ and MMIC's integrated equipment list in Amendment 0001 to the RFQ. MMIC asserts that it never discloses its Mobile Surgery Unit ™ layout (see Exhibit A) or its integrated equipment list (see Exhibit B) without identifying the information as confidential and proprietary. In Count II, MMIC alleges that the Agency violated the federal Trade Secrets Act, 18 U.S.C. § 1905, for the same reasons that it alleges the Agency violated the Procurement Integrity Act.

In Count III, MMIC alleges that the Agency acted arbitrarily and capriciously by misusing the FSS program. MMIC con-

---

**11.** Refer to Exhibit F for a copy of Amendment 0001, the Agency's list of equipment. The list does not outline the description of each piece of equipment in boxes, does not provide a picture of each piece of equipment, and does not mention MMIC. The list adds the term Brand Name or Equal to each piece of equipment, and it omits the dimensions and the capacity of the Ultrasonic Cleaner for the Soiled Utility Room. Otherwise, the list contains the equipment listed in MMIC's Budgetary Proposal, including the equipment manufacturer's name, model number, and description.

**12.** Refer to Exhibit G for a copy of Gerling's list of integrated equipment. Gerling omitted the Dual Head Surgical Light, the Double Panel X-

Ray Illuminator, the Pre–Vacuum Full Steam Sterilizer, and the Ultrasonic Cleaner.

**13.** Refer to Exhibit H for a copy of Gerling's rendering of the proposed mobile medical trailer.

**14.** Gerling submitted a modified request on September 24, 2009, in order to change the SIN (Special Item Number) under which Gerling proposed its new trailers be added (from SIN 618–01 to SIN 272–105). Plaintiff contends that during the RFI and RFQ period, Gerling did not have a trailer listed on its GSA schedule contract that was appropriate for surgical uses and that the modifications to its contract were outside the scope of Gerling's FSS contract.

tends that "[u]nder the FSS program, an agency may only place a task order with an FSS contractor who lists the offered product at the time of the offer and is approved to furnish the FSS item to government agencies." According to MMIC, during the RFI and RFQ process, neither Gerling nor [deleted] were approved by the GSA to offer mobile surgical trailers through their GSA schedule contracts. MMIC further contends that neither Gerling nor [deleted] were capable of creating the kind of mobile surgical trailers sought by the Agency at the time of the RFQ without knowledge of MMIC's confidential and propriety information, and that only because the Agency furnished Gerling and [deleted] with MMIC's information were the two firms qualified to compete for the task order.

In Count IV, MMIC alleges that the GSA arbitrarily and capriciously accepted Gerling's post-RFQ request of September 17, 2009, to modify Gerling's GSA FSS contract by adding three types of mobile surgical trailers. According to MMIC, "GSA may add only accept [sic] modifications that are within the scope of the original contract. If a modification is outside the scope of work originally contemplated, then the procurement of that item would require full and open competition." MMIC asserts that during the RFI and RFQ process, Gerling was not authorized under its GSA schedule contract to produce mobile surgical trailers and that such trailers were not a modification of the basic expandable trailer offered at the time by Gerling under its GSA schedule contract. In Count V, MMIC alleges that the Agency engaged in an uncompensated taking under the Fifth Amendment to the United States Constitution when it disseminated MMIC's Mobile Surgery Unit ™ layout and integrated equipment list.

Plaintiff requests a number of forms of relief. First, MMIC seeks a declaratory judgment that the task order award to Gerling and the modification to Gerling's GSA schedule contract were arbitrary and capricious. MMIC further seeks an order setting aside the task order award to Gerling, and resumption of sole source negotiations with MMIC. Additionally, MMIC seeks to enjoin the Agency from accepting mobile surgical trailers under the task order award to Gerling, from ordering such trailers from any contractor who received MMIC's allegedly confidential and proprietary information through the FSS, and from further disseminating MMIC's confidential and proprietary information. MMIC also seeks to enjoin "the GSA from offering mobile surgical trailers for sale or lease through the FSS" until an FSS contractor can demonstrate that its capacity for manufacturing such trailers is based in no part on MMIC's alleged trade secrets. Furthermore, MMIC seeks royalties for the temporary taking of its trade secrets. Finally, MMIC requests costs and attorney's fees.

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub.L. No. 104–320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)–(4) (2006)), amended the Tucker Act, providing the United States Court of Federal Claims with a statutory basis for bid protests. *See Resource Conservation Group, LLC v. United States,* 597 F.3d 1238, 1242–43 (Fed.Cir. 2010); *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1330–32 (Fed.Cir.2001). The statute provides that protests of agency procurement decisions are to be reviewed under Administrative Procedure Act (APA) standards, making applicable the standards outlined in *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970) and the line of cases following that decision. *See, e.g., Galen Med. Assocs., Inc. v. United States,* 369 F.3d 1324, 1329 (Fed.Cir.2004) (citing *Scanwell* for its reasoning that "suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law."), *reh'g denied* (Fed. Cir. 2004); *Banknote Corp. of Am., Inc. v. United States,* 365 F.3d 1345, 1351 (Fed.Cir. 2004) ("Under the APA standard as applied in the *Scanwell* line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332)); *Info. Tech. &*

*Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2003).

Agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (2)(D) (2006);[15] *see also Savantage Fin. Servs. Inc., v. United States,* 595 F.3d 1282, 1285–86 (Fed.Cir.2010); *Weeks Marine, Inc. v. United States,* 575 F.3d 1352, 1358 (Fed.Cir.2009); *Axiom Res. Mgmt., Inc. v. United States,* 564 F.3d 1374, 1381 (Fed. Cir.2009) (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332); *Blue & Gold Fleet, L.P. v. United States,* 492 F.3d 1308, 1312 (Fed.Cir.2007) ("[T]he inquiry is whether the [government's] procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A))); *Bannum, Inc. v. United States,* 404 F.3d 1346, 1351 (Fed.Cir.2005). In discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit specifically addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706. *See Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332 n. 5; *see also NVT Techs., Inc. v. United States,* 370 F.3d 1153, 1159 (Fed.Cir.2004) ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by

which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000).") (citations omitted); *Banknote Corp. of Am., Inc. v. United States,* 365 F.3d at 1350 ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (citing *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057–58 (Fed.Cir.), *reh'g denied* (Fed.Cir. 2000))); *Info. Tech. & Applications Corp. v. United States,* 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000).").

In *Garufi,* the United States Court of Appeals for the Federal Circuit wrote:

Under the APA standards that are applied in the *Scanwell* line of cases, a bid award may be set aside if either: (1) [T]he procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.... When a challenge is brought on the first ground, the courts have recognized that contracting officers are "entitled to exercise discretion upon a broad range of issues confronting them" in the procurement process. *Latecoere Int'l, Inc. v. United States Dep't of Navy,* 19 F.3d 1342, 1356 (11th Cir.1994). Accordingly, the test for reviewing courts is to determine wheth-

---

**15.** The full language of section 706 of the APA provides:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
(1) compel agency action unlawfully withheld or unreasonably delayed; and
(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.
5 U.S.C. § 706.

er "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion," *id.*, and the "disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" *Saratoga Dev. Corp. v. United States,* 21 F.3d 445, 456 (D.C.Cir. 1994). When a challenge is brought on the second ground, the disappointed bidder must show "a clear and prejudicial violation of applicable statutes or regulations." *Kentron [Hawaii, Ltd. v. Warner,]* 480 F.2d [1166,] 1169 [ (D.C.Cir.1973) ]; *Latecoere,* 19 F.3d at 1356.

*Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332–33 (selected citations omitted); *see also Centech Group, Inc. v. United States,* 554 F.3d 1029, 1037 (Fed.Cir.2009) (reaffirming the analysis of *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332); *Banknote Corp. of Am. v. United States,* 365 F.3d at 1351; *OMV Med., Inc. v. United States,* 219 F.3d 1337, 1343 (Fed.Cir.2000).

■ A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. *See Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 995–96 (Fed.Cir.1996); *Textron, Inc. v. United States,* 74 Fed.Cl. 277, 285 (2006), *appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc.,* 222 Fed.Appx. 996 (Fed.Cir.), 223 Fed.Appx. 974 (Fed.Cir.2007); *Labat–Anderson Inc. v. United States,* 50 Fed.Cl. 99, 106 (2001); *Emery Worldwide Airlines, Inc. v. United States,* 49 Fed.Cl. 211, 222, *aff'd,* 264 F.3d 1071 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2001); *Dynacs Eng'g Co. v. United States,* 48 Fed. Cl. 614, 619 (2001); *Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. 388, 392 (1999), *appeal dismissed,* 6 Fed.Appx. 867 (Fed.Cir. 2001).

■ The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action: The agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *Nat'l Ass'n of Home Builders v. Defenders of Wildlife,* 551 U.S. 644, 658, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007) (reasserting factors in *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. at 43, 103 S.Ct. 2856); *see also Alabama Aircraft Indus., Inc.-Birmingham, v. United States,* 586 F.3d 1372, 1375 (Fed.Cir.2009), *reh'g and reh'g en banc denied* (Fed.Cir. 2010) (noting that "[c]ourts have found an agency's decision to be arbitrary and capricious when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. at 43, 103 S.Ct. 2856)); *In re Sang Su Lee,* 277 F.3d 1338, 1342 (Fed.Cir.2002) ("The agency must present a full and reasoned explanation of its decision.... The reviewing court is thus enabled to perform a meaningful review ...."), *aff'd on subsequent appeal,* 262 Fed. Appx. 275 (Fed.Cir.2008); *Textron, Inc. v. United States,* 74 Fed.Cl. at 285–86. Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. at 43, 103 S.Ct. 2856 ("The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency."); *see also R & W Flammann GmbH v. United States,* 339 F.3d 1320, 1322 (Fed.Cir.2003) (citing *Ray v. Lehman,* 55 F.3d 606, 608 (Fed.Cir.), *cert. denied,* 516 U.S. 916, 116 S.Ct. 304, 133 L.Ed.2d 209 (1995)). "If the court finds a

reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed.Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971)); *see also Seaborn Health Care, Inc. v. United States,* 55 Fed.Cl. 520, 523 (2003) (quoting *Honeywell, Inc. v. United States,* 870 F.2d at 648 (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d at 1301)).

As stated by the United States Supreme Court:

> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citations omitted); *see also Nat'l Ass'n of Home Builders v. Defenders of Wildlife,* 551 U.S. at 658, 127 S.Ct. 2518 ("Review under the arbitrary and capricious standard is deferential[.]"); *U.S. Postal Serv. v. Gregory,* 534 U.S. 1, 6–7, 122 S.Ct. 431, 151 L.Ed.2d 323 (2001); *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), *reh'g denied,* 420 U.S. 956, 95 S.Ct. 1340, 43 L.Ed.2d 433 (1975); *Alabama Aircraft Indus., Inc.–Birmingham, v. United States,* 586 F.3d at 1376 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. at 43, 103 S.Ct. 2856)); *Weeks Marine Inc. v. United States,* 575 F.3d at 1368–69 (noting that review of agency pro-

curement decisions is highly deferential (citing *CHE Consulting Inc. v. United States,* 552 F.3d 1351, 1354 (Fed.Cir.2008))); *Co–Steel Raritan, Inc. v. ITC,* 357 F.3d 1294, 1309 (Fed.Cir.2004) (In discussing the "arbitrary, capricious, and abuse of discretion otherwise not in accordance with the law" standard, the Federal Circuit stated that "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); *In re Sang Su Lee,* 277 F.3d at 1342; *Advanced Data Concepts, Inc. v. United States,* 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. at 285, 95 S.Ct. 438)); *Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d 955, 959 (Fed. Cir.1993); *Gulf Group Inc. v. United States,* 61 Fed.Cl. 338, 351 (2004) ("Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); *ManTech Telecomms. & Info. Sys. Corp. v. United States,* 49 Fed.Cl. 57, 63 (2001), *aff'd,* 30 Fed.Appx. 995 (Fed.Cir. 2002); *Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. at 392 ("Courts must give great deference to agency procurement decisions and will not lightly overturn them." (citing *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985))).

Similarly, in *E.W. Bliss Co. v. United States,* the United States Court of Appeals for the Federal Circuit offered guidance on the applicable standard of review:

> Procurement officials have substantial discretion to determine which proposal represents the best value for the government. *See Lockheed Missiles & Space Co., Inc. v. Bentsen,* 4 F.3d 955, 958 (Fed.Cir.1993); *cf. Widnall v. B3H Corp.,* 75 F.3d 1577 (Fed.Cir.1996) (holding that Board of Contract Appeals should defer to agency's best value decision as long as it is "grounded in reason ... even if the Board itself might have chosen a different bidder"); *In re*

*General Offshore Corp.,* B–251969.5, B–251969.6, 94–1 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) ¶ 248, at 3 (Apr. 8, 1994) ("In a negotiated procurement, any proposal that fails to conform to material terms and conditions of the solicitation should be considered unacceptable and may not form the basis for an award. Where an evaluation is challenged, we will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion.") (citations omitted).

\*　　\*　　\*

Bliss' [other challenges to the procurement] deal with the minutiae of the procurement process in such matters as technical ratings ... which involve discretionary determinations of procurement officials that a court will not second guess. *See Lockheed Missiles & Space Co.,* 4 F.3d at 958; *Grumman Data Systems Corp. v. Widnall,* 15 F.3d 1044, 1048 (Fed.Cir.1994) ("[S]mall errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement.") . . . .

*E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir.1996); *see also Galen Med. Assocs., Inc. v. United States,* 74 Fed.Cl. 377, 383–84 (2006); *JWK Int'l Corp. v. United States,* 49 Fed.Cl. 371, 388 (2001), *aff'd,* 279 F.3d 985 (Fed.Cir.), *reh'g denied* (Fed.Cir. 2002).

 "It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." *Banknote Corp. of Am. Inc. v. United States,* 365 F.3d at 1355 (citing *TRW, Inc. v. Unisys Corp.,* 98 F.3d 1325, 1327–28 (Fed.Cir.1996); *E.W. Bliss Co. v. United States,* 77 F.3d at 449; and *Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d at 958–59); *see also Galen Med. Assocs., Inc. v. United States,* 369 F.3d at 1330; *Am. Tel. and Tel. Co. v. United States,* 307 F.3d 1374, 1379 (Fed.Cir.2002), *reh'g en banc denied* (Fed.Cir.), *cert. denied,* 540 U.S. 937, 124 S.Ct. 56, 157 L.Ed.2d 249 (2003); *Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d at 958; *Cybertech Group, Inc. v. United States,* 48 Fed.Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."). In a negotiated procurement, contracting officers are generally afforded even greater decision making discretion, in comparison to their role in sealed bid procurements. *See Galen Med. Assocs., Inc., v. United States,* 369 F.3d at 1331 (citing *Galen Med. Assocs., Inc., v. United States,* 56 Fed. Cl. 104, 108 (2003)); *Hayes Int'l Corp. v. United States,* 7 Cl.Ct. 681, 686 (1985) ("It is well-established that contracting officials are accorded broad discretion in conducting a negotiated procurement. . . ." (citing *Sperry Flight Sys. v. United States,* 212 Ct.Cl. 329, 339–40, 548 F.2d 915 (1977))). In *Burroughs Corp. v. United States,* the court described the broad discretion afforded a contracting officer in a negotiated procurement as follows:

> Remarking on the contracting officer's discretion in negotiation, the court in *Sperry Flight Systems Division v. United States,* 212 Ct.Cl. 329, 339, 548 F.2d 915, 921 (1977) noted that "the decision to contract—a responsibility that rests with the contracting officer alone—is inherently a judgmental process which cannot accommodate itself to absolutes, at least not without severely impairing the quality of the judgment called for ..." and that, "effective contracting demands broad discretion." Because of the breadth of discretion given to the contracting officer in negotiated procurement, the burden of showing this discretion was abused, and that the action was "arbitrary and capricious" is certainly much heavier than it would be in a case of formal advertising.

*Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 65, 617 F.2d 590, 598 (1980) (citation omitted; omissions in original); *see also Galen Med. Assocs., Inc. v. United States,* 369 F.3d at 1330; *LaBarge Prods., Inc. v. West,* 46 F.3d 1547, 1555 (Fed.Cir.1995); *JWK Int'l Corp. v. United States,* 49 Fed.Cl. at 388;

*ManTech Telecomms. and Info. Sys. Corp. v. United States,* 49 Fed.Cl. at 64.

The United States Court of Appeals for the Federal Circuit also has stated:

> Effective contracting demands broad discretion. *Burroughs Corp. v. United States,* 617 F.2d 590, 598 (Ct.Cl.1980); *Sperry Flight Sys. Div. v. United States,* 548 F.2d 915, 921, 212 Ct.Cl. 329 (1977); *see NKF Eng'g, Inc. v. United States,* 805 F.2d 372, 377 (Fed.Cir.1986); *Tidewater Management Servs., Inc. v. United States,* 573 F.2d 65, 73, 216 Ct.Cl. 69 (1978); *RADVA Corp. v. United States,* 17 Cl.Ct. 812, 819 (1989), *aff'd,* 914 F.2d 271 (Fed. Cir.1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." *Tidewater Management Servs.,* 573 F.2d at 73, 216 Ct.Cl. 69 . . . .

*Lockheed Missiles & Space Co., Inc. v. Bentsen,* 4 F.3d at 958–59; *see also Galen Med. Assocs., Inc. v. United States,* 369 F.3d at 1330; *Grumman Data Sys. Corp. v. Dalton,* 88 F.3d at 995; *Grumman Data Sys. Corp. v. Widnall,* 15 F.3d at 1046; *PHT Supply Corp. v. United States,* 71 Fed.Cl. 1, 11 (2006). Furthermore, the United States Supreme Court has stated that it will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife,* 551 U.S. at 658, 127 S.Ct. 2518 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. at 43, 103 S.Ct. 2856) (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)).

■ Barring arbitrary and capricious behavior or a violation of law, the wide discretion afforded contracting officers extends to a broad range of procurement functions, including the determination of what constitutes an advantage over other proposals. *See Tyler Const. Group v. United States,* 570 F.3d 1329, 1334 (Fed.Cir.2009) (Federal procurement entities have "broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation."); *see also CHE Consulting, Inc. v. United States,* 552 F.3d at 1354; *Textron, Inc. v. United States,* 74 Fed.Cl. at 286 (in which the court considered technical ranking decisions "minutiae of the procurement process" not to be second guessed by a court) (quoting *E.W. Bliss Co. v. United States,* 77 F.3d at 449). The question is not whether the court would reach the same conclusions as the agency regarding the comparison of proposals, but, rather, whether the conclusions reached by the agency lacked a reasonable basis and, therefore, were arbitrary or capricious, in which case, courts have a role to review and instruct.

■ To prevail in a bid protest case, the protester not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions. *See* 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error"). Recognizing the two-step analysis of bid protest cases, the Federal Circuit has stated that:

> A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

*Bannum, Inc. v. United States,* 404 F.3d at 1351. In describing the prejudice requirement, the United States Court of Appeals for the Federal Circuit has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. *See Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1581 (Fed.Cir.1996); *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." *Data General,* 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received

the contract award but for that error." *Statistica,* 102 F.3d at 1582; *see CACI, Inc.–Fed. v. United States,* 719 F.2d 1567, 1574–75 (Fed.Cir.1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award—that it was within the zone of active consideration.'") (citation omitted).

*Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.), *reh'g denied* (Fed.Cir. 1999) (citation omitted in original); *see also Labatt Food Serv. Inc., v. United States,* 577 F.3d 1375, 1378 (Fed.Cir.2009) (citing *Bannum, Inc. v. United States,* 404 F.3d at 1358; *Galen Med. Assocs., Inc. v. United States,* 369 F.3d at 1331; *Info. Tech. & Applications Corp. v. United Sates,* 316 F.3d at 1319; and *Statistica, Inc. v. Christopher,* 102 F.3d at 1581); *Myers Investigative & Sec. Servs., Inc. v. United States,* 275 F.3d 1366, 1370 (Fed.Cir.2002); *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332–33; *OMV Med., Inc. v. United States,* 219 F.3d at 1342; *Advanced Data Concepts, Inc. v. United States,* 216 F.3d at 1057; *Stratos Mobile Networks USA, LLC v. United States,* 213 F.3d 1375, 1380 (Fed.Cir.2000).

In *Data General Corporation v. Johnson,* the United States Court of Appeals for the Federal Circuit wrote:

> We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract. This is a refinement and clarification of the "substantial chance" language of *CACI, Inc.–Fed.,* 719 F.2d at 1574. The standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances.

*Data Gen. Corp. v. Johnson,* 78 F.3d at 1562; *see also Weeks Marine, Inc. v. United States,* 575 F.3d at 1359 (quoting *Rex Serv. Corp. v. United States,* 448 F.3d 1305, 1308 (Fed.Cir. 2006) and *Info. Tech. & Applications v. United States,* 316 F.3d at 1319); *Bannum, Inc. v. United States,* 404 F.3d at 1353, 1358 ("The trial court was required to determine whether these errors in the procurement process significantly prejudiced Bannum.... To establish 'significant prejudice' Bannum must show that there was a 'substantial chance' it would have received the contract award but for the [government's] errors" in the bid process. (quoting *Info. Tech. & Applications Corp. v. United States,* 316 F.3d at 1319; *Alfa Laval Separation, Inc. v. United States,* 175 F.3d at 1367; *Statistica, Inc. v. Christopher,* 102 F.3d at 1581; and *Data Gen. Corp. v. Johnson,* 78 F.3d at 1562)); *see also Galen Med. Assocs., Inc. v. United States,* 369 F.3d at 1331 ("To establish prejudice, the claimant must show that there was at 'substantial chance it would have received the contract award but for that error.'" (quoting *Statistica, Inc. v. Christopher,* 102 F.3d at 1582); *Myers Investigative & Sec. Servs., Inc. v. United States,* 275 F.3d at 1370 (using the "substantial chance" standard); *OMV Med., Inc. v. United States,* 219 F.3d at 1342 (invoking a "reasonable likelihood" of being awarded the contract test); *Advanced Data Concepts, Inc. v. United States,* 216 F.3d at 1057 (using a "reasonable likelihood" rule); *Stratos Mobile Networks USA, LLC v. United States,* 213 F.3d at 1380 (using a "substantial chance" test); *Info. Scis. Corp. v. United States,* 73 Fed.Cl. 70, 96 (2006) (using a "substantial chance" test), *recons. in part,* 75 Fed.Cl. 406, 412 (2007) (using a "substantial chance" test); *Park Tower Mgmt., Ltd. v. United States,* 67 Fed. Cl. 548, 559 (2005) (using a "substantial chance" test)). The Federal Circuit also has described a showing of prejudice as proving that one was in the "zone of active consideration" for the award of the contract. *Statistica, Inc. v. Christopher,* 102 F.3d at 1581 (citing *CACI, Inc.–Fed. v. United States,* 719 F.2d at 1574–75); *see also Alfa Laval Separation, Inc. v. United States,* 175 F.3d at 1367 (citing *CACI, Inc.–Fed. v. United States,* 719 F.2d at 1574–75).

Defendant argues that MMIC lacks standing to bring this protest. Accord-

ing to the United States Court of Appeals for the Federal Circuit, "[s]tanding to sue is a threshold requirement in every federal action." *Sicom Sys., Ltd. v. Agilent Tech.*, 427 F.3d 971, 975 (Fed.Cir.2005); *see also Labatt Food Serv., Inc. v. United States*, 577 F.3d at 1378 ("It is basic that 'because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits.'" (quoting *Info. Tech. & Applications Corp. v. United States*, 316 F.3d at 1319); *accord Myers Investigative & Sec. Servs. v. United States*, 275 F.3d at 1369–70 ("[S]tanding is a threshold jurisdictional issue.... [P]rejudice (or injury) is a necessary element of standing.")); *Galen Med. Assocs., Inc. v. United States*, 74 Fed.Cl. at 379–80; *Pure Power!, Inc. v. United States*, 70 Fed.Cl. 739, 744 (2006). The party invoking federal jurisdiction bears the burden of establishing standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d at 1369; *see also Rothe Dev. Corp. v. Dep't of Def.*, 413 F.3d 1327, 1334 (Fed.Cir.2005).

The Tucker Act provides that this court has "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); *see also Weeks Marine, Inc. v. United States*, 575 F.3d at 1359; *Banknote Corp. of Am., Inc., v. United States*, 365 F.3d at 1351–52 ("Under the Competition in Contracting Act (CICA), which governs the bid protest jurisdiction of the General Accounting Office (GAO), a protest may be filed by an 'interested party.' 31 U.S.C. § 3551(1) (2006). The CICA explicitly defines the term as an 'actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract.' 31 U.S.C.

§ 3551(2)."); [16] *Info. Tech. & Applications Corp. v. United States*, 316 F.3d at 1319 (in order to establish standing, a plaintiff must show that it is an "'actual or prospective bidder [ ] or offeror [ ] whose direct economic interest would be affected by the award of the contract or by failure to award the contract....'" (quoting *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed.Cir.2001), *cert. denied*, 534 U.S. 1113, 122 S.Ct. 920, 151 L.Ed.2d 885 (2002))) (brackets in original); *Infrastructure Def. Techs., LLC v. United States*, 81 Fed.Cl. 375, 384 (2008).

Although section 1491(b)(1) does not define the term "interested party," the United States Court of Appeals for the Federal Circuit has adopted the definition set forth in the Competition in Contracting Act, 31 U.S.C. § 3551(2)(A). According to the Federal Circuit:

[P]rejudice (or injury) is a necessary element of standing.... [A] potential bidder must establish that it had a substantial chance of securing the award in order to establish standing.... In bid protests under the Tucker Act, "we ... construe the term 'interested party' in section 1491(b)(1) in accordance with the [standing requirements of the] CICA and hold that standing under § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Am. Fed'n [of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed.Cir.2001) ]. Thus, the substantial chance rule continues to apply.

*Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d at 1370 (third omission in original). By establishing prejudice, a plaintiff can show a direct economic interest with respect to the CICA, 31 U.S.C. § 3551(2). *See Rex Serv. Corp. v. United States*, 448 F.3d at 1308.

▪▪▪ Generally, a non-FSS contractor, such as MMIC, cannot challenge a task order awarded through the FSS because it cannot

---

**16.** 31 U.S.C. § 3551(2) states: "The term 'interested party,' with respect to a contract or a solicitation or other request for offers described in paragraph (1), means an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract."

qualify as an actual or prospective bidder, given that FSS program contracts are awarded to prequalified, prospective FSS contractors.[17] Therefore, prospective contractors who were not prequalified as FSS contractors would not normally be in the category of "*actual or prospective bidders* or offerors whose *direct economic interest* would be affected by the award of the contract or by failure to award the contract." *Id.* at 1307 (quoting *Am. Fed. Gov't Employees v. United States,* 258 F.3d at 1302 and citing both *Banknote Corp. of Am., Inc. v. United States,* 365 F.3d at 1352 and *Myers Investigative & Sec. Servs., Inc. v. United States,* 275 F.3d at 1370) (emphasis in *Rex*). MMIC argues that this case falls under an exception to the general rule that when the item which is the subject of the RFQ is not on the awardee's FSS, "a non-FSS contractor may have standing to challenge the award of any non-FSS items on the FSS order, assuming it could have furnished them, because these non-FSS items are subject to the requirement for 'full and open competition' as defined in 41 U.S.C. § 259(b)(3) [2006]." (quoting *Eracent, Inc., v. United States,* 79 Fed.Cl. 427, 431 (2007)). The issue for plaintiff, therefore, is whether the procured items were on the awardee's GSA schedule contract or could have been considered "in-scope" of the items listed on the awardee's FSS contract.[18]

Defendant, however, asserts that the exception relied on by plaintiff only applies to non-FSS contractors challenging the decision to use the FSS to procure non-FSS items, whereas MMIC is challenging the manner in which the FSS was used to procure the mobile medical units. Defendant relies on *Klinge Corp. v. United States,* 87 Fed.Cl.

473, 478 (2009). The *Klinge* case, however, does not assist defendant. Protester Klinge Corporation was capable of competing on an Request For Proposals (RFP) for an indefinite delivery/indefinite quantity award, but not on an FSS RFQ because it was not qualified on a GSA schedule. *Klinge* argued that use of an RFQ instead of an RFP was "a pretext, either to avoid giving the contract to Klinge or to funnel the work to Sea Box [the schedule awardee]." *Id.* at 478. The plaintiff in *Klinge* also asserted that the Agency's use of the FSS mechanism violated the requirement in 48 C.F.R. § 8.405–1(c)(1) "Ordering procedures for supplies, and services not requiring a statement of work," (2009)[19] to first conduct a survey and determine if there were at least three potential FSS contractors, before proceeding with an FSS procurement. *Id.* at 476–78. The plaintiff in *Klinge* also argued "that the agency would have been unable to meet the requirements of FAR 8.405–6 ["Limited sources justification and approval," which requires an agency justification when there are fewer than three schedule offerors], and thus it would be forced back into the use of the RFP, for which plaintiff would be qualified to compete." *Id.* at 478. Rather than rejecting plaintiff's reasoning that it had standing to argue this issue, the *Klinge* court appears to have declined to pursue whether plaintiff's or defendant's interpretation of FAR 8.405–6 was correct. The *Klinge* court wrote:

> It is unnecessary to resolve which of the parties' interpretations of FAR 8.405–1(c)(1) is correct. Even if we agreed with plaintiff, we would decline to follow it into the thicket of FAR 8.405–6. In order to establish prejudice, plaintiff would have to

**17.** In the Joint Stipulation of Facts submitted to the court, both parties agree that "[d]uring the RFQ period between August 18 and August 31, 2009, Mobile Medical did not have an FSS contract for its mobile surgical or mobile endoscopy unit." In addition, plaintiff conceded that MMIC was a non-FSS contract holder and titled one of the sections of its first amended opening brief: "Whether Mobile Medical International Corporation ('Mobile Medical'), as a non-General Services Administration ('GSA') Federal Supply Schedule ('FSS') contract holder, has standing to challenge a task order award...." Plaintiff also stated in its brief "Mobile Medical as a non-FSS

contract holder, was arguably unable to compete for the award of the task order."

**18.** The Federal Acquisition Streamlining Act (FASA) of 1994, Pub.L. No. 103–355, § 1091, 108 Stat. 3243, 3272 (1994), codified at 41 U.S.C. § 253j(e) (2006), provides that a task order that increases the scope, period, or maximum value of the underlying master contract is an exception permitting protest of the task order under FASA.

**19.** Hereafter, 48 C.F.R. will be cited as the Federal Acquisition Regulation (FAR), as in, for example, FAR 8.405–1(c)(1).

eliminate a series of possible rationales made available to the agency there: that only one source is capable of responding due to the unique or specialized nature of the work; that the new work is a logical follow-on to a prior procurement; or that an urgent and compelling need exists. *See* FAR 8.405–6(b). The current state of the record does not permit an examination of these issues, nor should it. They are far too attenuated. The court would be drawn into collateral questions which require extensive factual inquiry and which would ultimately be impossible to answer with any certainty. In short, we limit plaintiff's standing to the argument that the agency chose to use an RFQ instead of an RFP simply as a pretext, either to avoid giving the contract to Klinge or to funnel the work to Sea Box. Plaintiff does not have standing to challenge the validity of the RFQ in any other context.

*Id.* In contrast to the *Klinge* case, the record in the present case permits examination of the validity of plaintiff's allegation that Gerling did not offer the requisite mobile surgical units on its GSA schedule and should not have been permitted to modify its GSA schedule to add such units, thereby rendering the FSS procurement mechanism improper.

In *ATA Defense Industries, Inc. v. United States,* a Judge of the United States Court of Federal Claims, writing on the definition of interested party, concluded that when an agency is accused of violating procurement procedures in a way that prevents a non-FSS contractor from bidding, the defendant cannot rely on the alleged procurement violations as a basis for claiming that the protestor was not an interested party as a pro-

spective bidder. *See ATA Def. Indus. Inc. v. United States,* 38 Fed.Cl. 489, 495 (1997). The court explained:

> The essence of plaintiff's contention is that the contracting officer, in violation of statutes and regulations, adopted procedures for the procurement that prevented plaintiff from offering the bid it intended to make, and had the contracting officer complied with proper procedures, plaintiff would have had an opportunity to submit its bid. Hence, in contending that plaintiff could not have expected to present a bid and hence was not a "prospective bidder," defendant relies upon the very procurement procedures that plaintiff alleges violated the law. But if these procedures did violate controlling statutes and regulations, then the procedures cannot properly serve as a rationale for excluding plaintiff from coming within the scope of Section 1491(b). Section 1491(b) is directed at permitting an "interested party" to secure legal redress when it has a sound objection to "the award of a contract or any alleged violation of statute or regulation in connection with a procurement." Defendant's interpretation of "prospective bidder" would render a party not an "interested party" where, for example, the party expressed its intent to bid on the contract work, was precluded from bidding in violation of controlling statutes and regulations, and would have prevailed in the competitive process had it been allowed to bid. It would seem hard to write a description of a party that is more "interested" in a contract award or more of a "prospective bidder" than a party that possesses these characteristics.

*ATA Def. Indus. Inc. v. United States,* 38 Fed.Cl. at 495;[20] *see also Eracent, Inc. v.*

**20.** Subsequent citations to the *ATA* case include comments in a United States Court of Appeals for the Fourth Circuit case, which takes a very narrow view of the definition of an interested party. *Baltimore Gas and Elec. Co. v. United States,* 290 F.3d 734, 737 (4th Cir.2002). The Fourth Circuit stated that in *American Federation of Government Employees v. United States,* 258 F.3d at 1302, the Federal Circuit "limited" the definition of "interested party" to " 'actual or prospective bidder or offeror' as provided in CICA § 3551(2)." *Baltimore Gas and Elec. Co. v. United States,* 290 F.3d at 737. The *American Federation* case, decided in 2001, however, was

no revelation on the definition if interested party in the Federal Circuit since "actual or prospective bidder or offeror" has been the definition in this Circuit for some time. Moreover, the *ATA* approach to including a prospective bidder such as plaintiff, when the issue is fundamental fairness under CICA and whether an open competition should have been held, is not inconsistent and would appear to represent solid reasoning today as it did when *ATA* was decided. *See, e.g., Cal. Indus. Facilities Res., Inc. v. United States,* 80 Fed.Cl. 633, 640–41 (2008). In the instant case, and as discussed below, however, this

*United States,* 79 Fed.Cl. at 431, decided in 2007.

■ If MMIC was prevented from bidding on the procurement in violation of controlling statutes and regulations, including CICA's requirement for fair and open competition, 41 U.S.C. § 253(a)(1) (2006), and if MMIC had a substantial chance of prevailing in an open procurement, then, in the interest of fairness, the plaintiff should be considered an interested party as an exception to the general rule and the dictates of CICA, that a non-FSS contractor is not allowed to protest an FSS award. Two major issues, however, are raised by plaintiff's protest: (1) whether the mobile medical trailers procured by the Agency were non-FSS items awarded to a contractor which did not have the items listed on its FSS contract, *see id.* at 431, and (2) whether plaintiff MMIC had a substantial chance of prevailing, but for the Agency decision to use the FSS, which eliminated plaintiff's opportunity to compete, and, therefore, whether MMIC was prejudiced. *See Rex Serv. Corp. v. United States,* 448 F.3d at 1308.

■ With respect to the first question, plaintiff contends that the trailers added to Gerling's GSA schedule contract by modification, after the RFQ was issued and after Gerling submitted its original quote in response to the RFQ, differed so greatly from the existing trailers on Gerling's GSA schedule contract at the time the RFQ was issued as to render the trailers outside the scope of Gerling's original GSA schedule contract. Plaintiff alleges that the Agency's procurement violations included awarding the contract to Gerling when the procured items were not listed on its GSA schedule contract prior to Gerling submitting a quote and the Agency accepting a quote from [deleted] when it did not provide required documentation.[21] In response, defendant asserts that the trailers added to Gerling's GSA schedule contract were merely in-scope modifications of trailers already listed Gerling's FSS con-

tract. Defendant further contends that contractors may offer quotes for items not listed on their GSA schedule contracts, "so long as the item is on the FSS contract at the time the agency ordered the item," in which case the award is proper.

In the instant case, Gerling's FSS contract was modified before the award. The items which were the subject of the procurement, however, were not on Gerling's FSS contract at the time Gerling responded to the RFQ and the RFQ had closed. In this regard, a Judge of the Court of Federal Claims stated in *Eracent,* "To place an order using the GSA FSS procedures, the contracting agency must certify that all items on the order are within the scope of the vendor's FSS contract." *Eracent, Inc. v. United States,* 79 Fed.Cl. at 430 (emphasis added). In *Eracent,* therefore, the focus was on when the order was *placed.* In *Matter of Armed Forces Merchandise Outlet,* B–294281, 2004 WL 2625027, at *4 (Comp.Gen. Oct. 12, 2004) the Government Accountability Office (GAO) stated:

> [N]on–FSS products and services may not be *purchased* using FSS procedures; instead their *purchase* requires compliance with the applicable procurement laws and regulations, including those requiring the use of competitive procedures.... [T]he solicitation did announce the agencys [sic] intention to *order* from an existing GSA contractor; in our view, this was sufficient to place vendors on notice that the agency intended to *order* all items using GSA FSS procedures and hence that all items were required to be within the scope of the vendors FSS contract.

*Id.* (citing *Altos Federal Group Inc.,* B–294120, 2004 WL 1791349, at *3 (Comp.Gen. July 28, 2004)) (emphasis added). In *Matter of Armed Forces Merchandise Outlet,* the directive was to not purchase or order a non-FSS item using the FSS mechanism. *In The CDM Group, Inc.,* B–291304.2, 2002 WL 31869253, at *2 (Comp.Gen. Dec. 23, 2002),

---

plaintiff cannot sustain a protest on other grounds, because plaintiff cannot demonstrate it was prejudiced and, therefore, cannot demonstrate standing.

**21.** Because [deleted] was not the awardee on the procurement at issue, and plaintiff cannot sustain the protest on other grounds, allegations with respect to [deleted] will not be addressed further in this opinion.

the GAO stated "[a]n agency cannot properly select an FSS vendor for an *order* of items on the vendor's schedule and then include in the *order* items not included in that vendor's FSS contract...." (emphasis added).[22]

Defendant's position, to permit modification of an FSS contract up to the time the order is placed by an agency under an FSS, would permit an agency to procure a non-FSS item through the FSS by sending out a solicitation "feeler," and then evaluate quotes for items that did not exist on GSA schedule contracts, with the hope that a selected contractor could modify its contract to include the items sought, thereby eliminating other non-FSS contractors from the competition. Defendant's modification approach appears to allow targeted pre-selection of contractors outside the FSS system, which is inconsistent with the FSS system, as well as the general goals of fair and open competition espoused in CICA, at 41 U.S.C. § 253. CICA provides that an agency when involved in procuring property or services "shall obtain full and open competition through the use of competitive procedures in accordance with the requirements of this title and the Federal Acquisition Regulation...." 41 U.S.C. § 253(a)(1); *see also T & M Distrib., Inc. v. United States,* 185 F.3d 1279, 1282 n. 2 (Fed. Cir.1999). If there are no FSS qualified contractors, the agency is required to compete the award. *See* FAR 8.405–1(c)(1). If, in fact, CICA was violated by the Agency's actions, then the instruction in 28 U.S.C. § 1491(b) that gives jurisdiction to this court to address "an action by an interested party

objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," as well as FAR 8.404(c)(3), "Use of Federal Supply Schedules" (2009), which states: "Orders placed under a Federal Supply Schedule contract ... (3) Must ... be consistent with the requiring agency's statutory and regulatory requirements applicable to the acquisition of the supply or service," would be in play.

In the case before the court, defendant concedes that the medical trailers were not offered through Gerling's FSS contract at the time Gerling submitted its quote to the Agency in response to the RFQ. Defendant further acknowledges that submitting a modification request post-quote put Gerling in jeopardy of not being able to deliver on its quote, having submitted a quote for items it did not have listed on its FSS, in the event the GSA denied the modification request. The fact that the potential harm never materialized (i.e., the possibility of Gerling failing to deliver on the quoted offer) and that Gerling obtained the modification before the order was placed, does not excuse the Agency from violating, at a minimum, the spirit of CICA by accepting a quote on the FSS for an item that was not on Gerling's GSA schedule contract at the time the quoted offer was submitted and the RFQ closed.

In fact, before the GSA approved Gerling's modification request, GSA criticized Gerling for quoting items that were not on Gerling's

---

**22.** The two cases cited by the defendant also are equivocal on the subject of when a modification must be placed on the FSS to qualify a contractor under an RFQ utilizing the FSS. In *Sea Box, Inc.,* B–401523, 2009 WL 3086554, at *4 (Comp. Gen. Sept. 25, 2009), the GAO did not have to address the issue because based on the facts, Sea Box had received its modification and necessary additions to its FSS by the closing date of the RFQ and the purchase order was issued subsequent to that date. Moreover, the GAO noted that: "The RFQ, however, did not identify the point at which the status of the offered items would be determined." *Id.* at *2 n. 5. With respect to *Science Applications International Corp.,* B–401773, 2009 WL 3802412, at *2 (Comp.Gen. Nov. 10, 2009), also cited by the defendant, the GAO stated, "[w]e reject the agency's position that it was proper to issue an order

to Rapiscan because the ordered items will be added to its FSS contract prior to the *delivery date." Id.* (emphasis added). These cases, which are not binding precedent on this court, also do not resolve the question posed in our case as to whether a modification can take place between the time the RFQ is released and the time the order is issued. In a footnote, the *Science Applications* decision did state, "[w]e note that in, in response to our request for its views regarding this same issue in *Symplicity Corp.,* [B–291902, 2003 WL 1989428 (Comp.Gen. Apr. 29, 2003)], the General Services Administration, the agency responsible for administering the FSS program, expressed a view consistent with our holding there—when an agency conducts a procurement under the FSS program, all items ordered must be on the vendor's FSS contract at the time the order is issued." *Id.* at *1 n. 1.

GSA schedule contract. After the contract specialist inquired, and was informed by Gerling that the items it sought to add to its contract had already been quoted to the Agency, the contract specialist responded:

> [I]n the future you can not [sic] quote items that have not been approved under contract as a schedule purchase. If the products have not been approved under contract you must quote them as open market items. If this occurs again, Gerling's contract will be in noncompliance of the contract terms and conditions.

Gerling responded, acknowledging that it was improper to quote items that were not on its schedule and stated:

> Yes I understand, [sic] My sales staff did not previously understand the process of Ebuy [sic] and how it works with having approved products on the schedule. I have been very clear with them, that they can no longer quote items from ebuy [sic] without having the product previously approved to be added to the schedule. Gerling and Associates does understand that we can only quote items on ebuy [sic] if they are already approved and added to our schedule. We will follow the correct procedures for all future ebuy [sic] quotations.

To determine whether an item offered by a contractor is a non-FSS item, "the relevant inquiry is not whether the vendor is willing to provide the services that the agency is seeking, but whether the services or positions offered are actually included on the vendor's FSS contract, as reasonably interpreted." *See Tarheel Specialties, Inc.*, B–298197, 2006 WL 2820577, at *4 (Comp.Gen. July 17, 2006) (citing *Am. Sys. Consulting, Inc.*, B–294644, 2004 WL 2985207, at *5 (Comp.Gen. Dec. 13, 2004)). In this case,

after providing its quote to the Agency, Gerling requested modification of its FSS contract to include: a Citadel Operation Room Trailer, a Citadel Endoscopy Room Trailer, and a Citadel Recovery Room Trailer, items which were not already listed on its GSA schedule contract.[23] At the time of its quote, Gerling offered a Citadel Class Dual Expanding Trailer on its GSA schedule contract that was described as a:

> 53' Smooth Side Aluminum Mobile Command Trailer, 51' Expanding Side, 60" throw, 60,000 GWR, king pin, sweep out style aluminum storage bay system, custom rub rail system, custom fleet white DuPont paint, four (4) man doors with custom aluminum stairs and handrails, 5–point manual jack system, two (2) 25–gallon water tank plumbing system, scene lighting, emergency lighting, operations, conference room, work stations, fully insulated ceiling, floors and walls, carpeted interior walls, rubber flooring custom oak cabinetry and storage, custom countertops and conference tables, galley, lavatory, microwave, coffee maker, refrigerator, toilet, two (2) sinks, Sani–Dex wipe system, vanity mirror and sink, two (2) 4–ton wall mount air conditioning system with 5,000 kW heat strips each, 150 amp shore power system, and 12V DC system.

The contracting officer contended, in response to MMIC's original GAO protest, that the new trailers "merely modified the already available [Citadel Class Dual Expanding Trailer] with in scope customizations the [Agency] required."

The suggestion has been made by defendant that the modification may have related to the only medical-type trailer listed on Gerling's pre-quote FSS contract, a Citadel Mobile Lab[24] described as:

---

**23.** Defendant is correct that Gerling was allowed to modify its GSA contract under GSA Contract clause 552.243–72, "Modifications (Multiple Award Schedule) (Jul 2000)," which permits modifications on GSA FSS contracts. However, the issue here is whether Gerling's modifications were in-scope and timely.

**24.** There does not appear to be any evidence in the record indicating that Gerling considered the new trailers a modification to any particular trailer on its then existing GSA schedule con-

tract, other than the fact that it identified the new trailers as belonging to its line of Citadel trailers. Gerling first requested the new trailers be added under the SIN 618–01, but soon thereafter requested that the new trailers be added under the SIN 272–105, the SIN used by GSA to add the trailers to Gerling's FSS Contract. On its pre-modification GSA schedule contract, Gerling's Citadel expanding and mobile lab trailers are listed under SIN 023–101, but on its postmodification GSA schedule contract, Gerling's Citadel expanding trailer is listed under SIN

53′ Great Dane Mobile Laboratory Trailer, 60,000 GVWR, king pin, sweep out style steel storage bay system, custom rub rail system, 4–point manual jack stabilization system, custom fleet white DuPont paint, two (2) 4–ton air conditioning system with 5,000 kW heat strips each, custom passage way for trailer to trailer walk thru, one (1) entrance door, one (1) security door, two (2) rear swing doors, one (1) passage way door, diamond brite aluminum platform and stair system, twelve (12) Scene Lights, eight (8) exterior windows, ten (10) tie down rings, fully insulated ceiling, floors, walls, FRP interior walls, rubber flooring, drop ceiling, custom power system Including main power, air conditioning power, and shore power, plumbing system, holding tanks, 12 gallon electric hot water heater, cable raceways for communication equipment, internal LAN wiring, telephone wiring, weather emergency radio antenna, safety equipment, optional room selection including, Lab room, Phlebotomy room, Dental room, Staff room, Interview room, Spiro Room, Vision room, Exam room, Physical room, Anthro R[oom].

The question remains whether a modification creating a mobile surgical, mobile endoscopy, or mobile recovery room is within the scope of either the Citadel Class Dual Expanding Trailer or the Citadel Mobile Lab, as "reasonably interpreted," or whether the new trailers were entirely new items which, in order to qualify under the FSS, should have been added to Gerling's GSA schedule contract before a quote for them was submitted to the Agency in response to an outstanding RFQ.

In its quote in response to the RFQ, Gerling had offered to provide three operating room trailers, two endoscopy procedure room trailers and one recovery room trailer with specifications required by the Agency in its RFQ. The operating room trailer included:

an operating room, nurse's call system, clean and soiled utility rooms with sinks, integrated medical gases, dual surgical light, double panel x-ray illuminator, prevacuum steam sterilizer, ultrasonic cleaner, equipment and utility connections to provide mop sink, nurse's station sink, scrub sink, bathroom sink, soiled utility room sink, clean utility room sink, and sterilizer, medical gas system, anesthesia station, restroom, and cabinetry.

The endoscopy procedure room trailer included:

two procedure rooms, pre and post op recovery areas with room for three patient care stations, a nurse's call system, a clean utility room, integrated medical gasses, a double panel x-ray illuminator, pre-vacuum full steam sterilizer, equipment and utility connections to provide mop sink, nurse's station sink, scrub sink, bathroom sink, soiled utility room sink, clean utility room sink, and sterilizer, medical gas system, anesthesia station, restroom, and cabinetry.

The recovery room trailer included:

pre and post op recovery area with room for six patient care systems, a nurse's station, nurse's call system, utility room, integrated medical gas zone, equipment and utility connections for nurse's station sink, bathroom sink, and utility room sink, medical gas system, restroom, and cabinetry.

In addition, all trailers would include:

insulation, two (2) 4–ton air conditioning units, 5,000 kW heating units, a HEPA filter system, 208V three phase 60 Hertz power system, 200A power source, two (2) Hevi–Duty SOLA Isolation Transformers, analog meters, three phase 208V main power distribution panel boards, grounding, 12V DC system, one (1) 10 KVA APC UPS backup power system, one (1) Kohler 20 kW Diesel Generator, one (1) 50′ 200 amp 208 volt three phase 5–wire Shore power cables, one (1) 50′ 200 amp 208 volt three phase 5–wire extension cable, 20 amp circuits, hospital grade receptacles twelve (12) exterior and eight (8) general purpose, 2×2 115v fluorescent lamp fixtures, fire detection and suppression system, drainage system, 16 gallon electric hot water heater, water supply system for city water hookup, water filter system, city connection pipes, 3 holding tanks, cable raceways, 25–par Cat 5 Telecom cable, internal LAN

618–01, and its Citadel mobile lab is listed under SIN 023–101.

wiring, telephone service, telecommunications unit, synchronized time system, alarm system, weather emergency radio, and safety equipment.

Taking a liberal view of the trailers offered by Gerling on its modified GSA schedule contract, it would appear that the modified trailers differ significantly from the original expanding trailer and lab trailer on Gerling's original GSA schedule contract. Many of the basic hookups may have been similar, such as for the safety equipment, electricity, water, heat, and air conditioning, but the trailers are dissimilar in other significant ways. The only medical aspects of Gerling's original GSA schedule contract trailers are in the names of the mobile lab unit and the optional rooms therein. None of the equipment contained within the optional rooms, however, compares to the equipment in the modified trailers on Gerling's modified GSA schedule contract. The optional lab room for the original Citadel Dual Class Expanding Trailer contained cabinetry, countertops, one sink with auto faucet, one eyewash station, and a mobile file cart. The optional exam room was nothing more than an 8′ × 10′–12′ room with a pocket door. The optional dental and phlebotomy rooms had cabinets, countertops, one sink, a pass-through door for specimens, a pocket door, and fold up seat. Neither of Gerling's original trailers had the integrated equipment necessary to perform surgery, take x-rays, or sterilize medical equipment, unlike its new Citadel surgical room (designed for surgery, x-rays and sterilization) and an endoscopy room (designed for x-rays and sterilization). Gerling's original trailers did not have air filtration systems, sterile environments, plumbing, or the internal wiring necessary for a surgical room, modifications that would require changes to the structure of the trailer itself, not just to the mobile internal components.

The new Citadel Recovery Room Trailer offered by Gerling on its modified GSA schedule contract comes within the closest fit of the original trailers, the only significantly differing items being the medical gas system and nurse's call station. Regarding the surgical and endoscopy trailers, however, Gerling's modifications transformed the original trailers from mere shells, fit for general office use, to medical units comparable to sophisticated emergency rooms. Indeed, the original trailers seem suitable for little more than general office use. Outfitted with a coffeemaker, refrigerator, conference tables, and restroom with vanity mirror, the Citadel Class Dual Expanding Trailer evokes images of the stereotypical office, and the Citadel Mobile Lab Trailer, at best, reminds one of a Red Cross bloodmobile.

Beyond comparing the technical outfittings of Gerling's original and modified trailers, other aspects of Gerling's modified GSA schedule contract indicate that Gerling's modified trailers were not simple adjustments to the trailers on its original GSA schedule contract. For instance, Gerling's original expanding trailer and mobile lab trailer were listed with a 125–day turnaround time. In contrast, Gerling's surgical, endoscopy, and recover room trailers are listed with a 240–day turnaround time, which is nearly double the time it takes to produce one of its original stripped down trailers. That Gerling posited the production and delivery time of its new trailers at nearly 100% greater than for its original trailers strongly confirms that the new trailers are far more than mere in-scope modifications of the original trailers. Significantly, Gerling did not complete and deliver the trailers within 240 days. On day 237, June 2, 2010, the contracting officer indicated that Gerling had completed only production of the basic trailer components (i.e., the shell, axles, and expanding sides), and that only the trailer shells had been completed, but not the "guts" (the subject of the modifications to Gerling's FSS contract). Additionally, according to the contracting officer, on June 2, 2010, Gerling was still waiting for the government's approval of its final engineering designs for the plumbing, electrical and mechanical drawings.

Gerling's GSA contract modification request included more than seventy-five pages of technical specifications and design details of the three trailers it wished to add to its FSS contract. The sheer volume of the modification request, and the fact that Gerling conceded it was adding a completely "new item" to its GSA schedule contract, further

illustrate that the new Gerling medical trailers were not in-scope modifications of trailers already listed in Gerling's GSA schedule contract. In sum, Gerling was offering non-FSS items in response to the FSS RFQ, although its FSS modifications were later approved. The modification to Gerling's GSA schedule contract departed so far from its original schedule as to render the modified Gerling trailers, certainly with respect to the surgical and endoscopy trailers, outside the scope of its FSS contract as reasonably interpreted. As a result, but for other issues raised by the record, the exception to the standing requirement under which non-FSS contractors may challenge the award of non-FSS items through the FSS would be met in this case. *See Eracent, Inc. v. United States*, 79 Fed.Cl. at 431 (a non-FSS contractor may challenge the award of what are actually non-FSS items, which were nevertheless included in an FSS award).

■ Although plaintiff has established that the modifications of Gerling's trailers were not within the scope of Gerling's original quote in response to the RFQ, MMIC cannot demonstrate that, but for the Agency's procurement choice to use the FSS, plaintiff would have prevailed in a competitive procurement and, therefore, that plaintiff was prejudiced. MMIC is unable to meet the second prong of the standing test, that of demonstrating prejudice. "[P]rejudice (or injury) is a necessary element of standing." *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d at 1370. To establish prejudice, the protestor must show that, but for the alleged procurement violations, MMIC would have had a substantial chance of receiving the award; there must have been a reasonable likelihood that MMIC would have won the contract had there been open competition. *See Rex Serv. Corp. v. United States*, 448 F.3d at 1308; *Data Gen. Corp. v. Johnson*, 78 F.3d at 1562. The burden is on the plaintiff to demonstrate that it would have had a substantial chance of winning the procurement. *See Am. Fed'n of Gov't Employees v. United States*, 258 F.3d at 1302; *Eracent, Inc., v. United States*, 79 Fed.Cl. at 431 (citing *ATA Def. Indus. Inc. v. United States*, 38 Fed.Cl. at 494–97).

Several factors indicate that sufficient prejudice to plaintiff cannot be established based on the record before the court. Plaintiff seeks a sole source award to itself or, in the alternative, for there to be an open competition. First, plaintiff's claim to be the sole source of JCAHO certified trailers is unpersuasive. MMIC claims that the Agency required JCAHO certified trailers, of which plaintiff alleged it was the only source. However, JCAHO certification was not required to be confirmed by the Agency until after installation, connection, and testing found that the trailers complied with this and the other requirements listed throughout the RFQ. Specifically, the RFQ stated, "[a]fter delivery, installation, and activation, each mobile operation and procedure room trailer shall be certified to be compliant with the requirements of NFPA, JCAHO, AIA guidelines and other applicable authorities and entities...." Thus, any contractor who could manufacture the trailers for the Agency and gain JCAHO or other required certifications after installation could have competed against MMIC in an open competition. As a result, plaintiff's claim to be the sole source on this basis is unsubstantiated and premature. Other than plaintiff's allegation, there is no evidence in the record to demonstrate that no other manufacturer could have gained certification, post-installation, in time to meet the timing requirements of the Agency's RFQ.

Second, plaintiff has not given the court reason to conclude that it would have had a "substantial chance" of winning the contract despite almost certain competition from other offerors. Plaintiff has not provided persuasive proof that it was the sole source, given the potential offerors who responded to Sources Sought Notification posted by the contracting officer, several of which specifically disputed plaintiff's claim of being the sole source capable of providing the sought after units. To prevail, plaintiff would have to prove a substantial chance of winning the procurement, not only against offers from FSS contractors who may have been able to produce post-installation approved trailers, but also against offers from all non-FSS contractors with that ability to do so in an open competition. Considering the FSS

contractors alone, there were several who provided information, or whose website stated, that they had experience manufacturing surgical trailers, and that mobile surgical trailers were among their specialty, before the alleged disclosure of MMIC's proprietary information. For example, [deleted] responded to the Agency's Sources Sought Notification with information that it had a mobile medical facility with complete surgical capabilities. Matthews Specialty Vehicles' website documented mobile surgical units among its specialty. Mobile Specialty Vehicles' website also listed mobile surgery/E.R. units. If these surgical trailers were not listed on the vendors' FSS contracts, in full and open competition, these providers could have submitted bids because the Agency would not have been limited to the companies pre-qualified on the GSA FSS. Although the record contains no information regarding the capabilities of FSS or non-FSS contractors to obtain the post-installation certifications, the responses to the Agency's Sources Sought inquiry is sufficient to refute plaintiff's allegations that it alone was the sole source for the procurement the Agency sought. Had the solicitation been advertised in the open market, MMIC likely would have had substantial competition. Indeed, at least [deleted] FSS contractors bid, or showed an interest in bidding, on the RFQ and could have bid in an open competition. The existence of these competitors weighs against any attempt by the Agency to produce a sole source justification in favor of plaintiff or plaintiff's claim to be a sole source provider.

Third, MMIC's poor Dun & Bradstreet score at the time the procurement decisions regarding this contract were being made also weighs against a finding of prejudice to plaintiff. While MMIC never was formally considered non-responsible, its Dun & Bradstreet score of [deleted] on a scale from 1 to 9, with a 9 being the worst rating, was unacceptable to the contracting officer.[25] At the time the Dun & Bradstreet report was run, MMIC was considered such a high-risk contractor that had the contracting officer continued the sole source procurement process with plaintiff, the contracting officer would have been required to attempt to justify doing so under VA policy and Directives.[26] Based on the information the contracting officer had available at the time she made her decision on this procurement, including the high business risk which the Dun & Bradstreet rating on MMIC represented, in her discretion, the contracting officer opted not to attempt to further justify a sole source award to plaintiff. Whether or not MMIC received another VA contract award a little more than a month later does not negate the rationality of the contracting officer's decision not to proceed with a sole source award at the time she made her decision. The contracting officer was within her authority at the time not to consider MMIC as suitable for a sole source award. Her decision to cease sole source negotiations with plaintiff and not to further investigate plaintiff's financial situation was reasonable and within the contracting officer's discretion. *See Banknote Corp. of Am., Inc. v. United States*, 365 F.3d at 1351.

Fourth, in its proposal MMIC required a [deleted]% advance payment, which exceeded the 15% payment permitted by FAR 32.202-2, "Types Of Payments For Commercial Item Purchases" (2009). In her response to the GAO protest, the contracting officer confirmed that a [deleted]% payment was required by MMIC. As such, by FAR regulation, the Agency could not procure the trailers using the plaintiff's offer.

---

25. In its brief, the plaintiff points out that a little more than a month later another contracting officer in the Miami office of the VA found MMIC to be responsible and awarded MMIC a contract on November 13, 2009, after a further review of MMIC's accounting records and letters from its lending institutions. However, responsibility determinations may vary, depending on differing procurements and differing time frames.

26. "If the contractor has a Supplier Evaluation Risk Score of '7' or higher, the contracting officer must document the additional due diligence conducted to justify an award in light of the higher risk score within the contract file." Department of Veterans Affairs Letter to the Heads of Contracting Activities and VA Contracting Officers, IL 049-08-03, "Use of Dun and Bradstreet Reports as a Means of Assisting in Determining Contractor Responsibility" (Apr. 11, 2008).

Fifth, MMIC's quoted price for the trailers was $[deleted].[27] The price quotes by competitors [deleted] and Gerling were significantly lower than the one submitted by MMIC, indicating that in an open competition other offerors likely would have undercut MMIC's total offered cost. Gerling's quote was $[deleted], and the quote offered by [deleted] was $[deleted]. Furthermore, the contracting officer stated that several other FSS contractors had pricing similar to Gerling's for similar trailers. MMIC was not price competitive. Indeed, the contracting officer stated, "MMIC wanted [deleted]% deposit, and would take an average of 9–11 months to build the MSU's [mobile surgical units]. A red flag went up that there were obvious issues to just sole sourcing this requirement to MMIC. Once, the meeting [with MMIC and the program office] concluded I informed the program office that a sole source award could not be made to MMIC[.]" The contracting officer also stated, in response to plaintiff's GAO protest, that "[i]t is felt that MMIC would have been high risk, based on the Supplier Risk Evaluation of [deleted], high cost and the [deleted]% deposit they were requiring."

Sixth, MMIC argues that it would have had a substantial chance of winning the contract had [deleted] or Gerling's offers been rejected, "given its [MMIC's] previous dealings with the Agency through the sole-source procurement process undertaken between December 2008 and May 2009." The record, however, does not substantiate plaintiff's claim. The record has revealed no reason for the court to conclude that plaintiff would have had a substantial chance of winning a contract simply because plaintiff had, at one time, been in sole source negotiations with the Agency or even received an earlier sole source contract, unrelated to this bid protest. To the contrary, the record reveals that the sole source negotiations were the very reason that the Agency learned of plaintiff's exceedingly high Dun & Bradstreet score, identified the [deleted]% advance payment plaintiff re-

quired, which was not permitted by regulation, and established that several competitors were interested in providing the mobile medical trailers at a significantly lower price. Moreover, the fact that the Agency discontinued the sole source procurement process with plaintiff negates any argument that further sole source negotiations would have given the Agency reason to award a sole source contract to plaintiff.

In sum, plaintiff has not met its burden of establishing prejudice. The record indicates that in all probability the plaintiff would have had at least five FSS competitors, and perhaps more non-FSS competitors in open competition. Also, considering that, according to the Dun and Bradstreet report at the time the rating was run, plaintiff was a high-risk contractor, and that plaintiff's quoted contract price totaled over [deleted] (approximately [deleted] more than Gerling's price), the chance that plaintiff would have won a contract in a competitive procurement was not "substantial." *Alfa Laval Separation, Inc. v. United States*, 175 F.3d at 1367. Therefore, the court finds that plaintiff has not met its burden to demonstrate prejudice and, thus, lacks standing to bring this bid protest. Counts III (arbitrary and capricious action by the Agency) and IV (arbitrary and capricious action by the GSA) of the complaint are dismissed.

*Proprietary Information*

 MMIC alleges that Agency personnel violated the Procurement Integrity Act, 41 U.S.C. § 423(a)(1), along with integrity regulations, FAR 3.104–1 et seq. (2009), and the Trade Secrets Act, 18 U.S.C. § 1905. Plaintiff alleges violations of the statutes also provide the requisite jurisdiction in this court pursuant to 28 U.S.C. § 1491(b)(1) to review plaintiff's bid protest based on a violation of law, although the plaintiff also argues that the court should do so the "within the meaning of § 10(e) of the Administrative Procedures [sic] Act, [sic] U.S.C. § 706."[28] Plain-

---

**27.** The contracting officer lists plaintiff's total contract value at $[deleted], and plaintiff's Budgetary Proposal lists the contract value at $[deleted], plus quarterly maintenance, which typically equals [deleted]% of the purchase price.

**28.** Plaintiff's citation to § 10(e) of the Administrative Procedure Act appears to refer to the scope of review language subsequently codified at 5 U.S.C. § 706. However, traditional Administrative Procedure Act review, leading to deci-

tiff alleges that the Procurement Integrity Act and the Trade Secrets Act were violated after Agency officials improperly disclosed MMIC's proprietary information, namely plaintiff's allegedly trade secret equipment list, as well as the design layout of plaintiff's Mobile Surgery Unit.■

■ Although the parties argued around the point, plaintiff is correct that: "The language of § 1491(b), however, does not require an objection to the actual contract procurement, but only to the 'violation of a statute or regulation in connection with a procurement or a proposed procurement.' The operative phrase 'in connection with' is sweeping in scope. As long as a statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction." *RAMCOR Services Group, Inc. v. United States*, 185 F.3d 1286, 1289 (Fed.Cir. 1999) (quoting 28 U.S.C. § 1491(b)(1)). Regardless, plaintiff's standing to bring the suit fails, as discussed below, because no improper disclosure occurred and because as discussed above, plaintiff cannot establish prejudice in order to proceed and succeed on its bid protest suit.

The Procurement Integrity Act provides in relevant part:

(a) Prohibition on disclosing procurement information

(1) A person described in paragraph (2) shall not, other than as provided by law, knowingly disclose contractor bid or proposal information or source selection information before the award of a Federal agency procurement contract to which the information relates....

(2) Paragraph (1) applies to any person who—

(A) is a present or former official of the United States, or a person who is acting or has acted for or on behalf of, or who is advising or has advised the United States

with respect to, a Federal agency procurement; and

(B) by virtue of that office, employment, or relationship has or had access to contractor bid or proposal information or source selection information.

41 U.S.C. § 423(a).

Section 423(f)(1)(A–D) of the Procurement Integrity Act defines "contractor bid or proposal information" in relevant part as:

(A) Cost or pricing data....

(C) Proprietary information about manufacturing processes, operations, or techniques marked by the contractor in accordance with applicable law or regulation.

(D) Information marked by the contractor as "contractor bid or proposal information," in accordance with applicable law or regulation.

41 U.S.C. § 423(f)(1)(A–D).

The Trade Secrets Act states in relevant part:

Whoever, being an officer or employee of the United States or of any department or agency thereof, ... publishes, divulges, discloses, or makes known in any manner or to any extent not authorized by law any information coming to him in the course of his employment or official duties or by reason of any examination or investigation made by, or return, report or record made to or filed with, such department or agency or officer or employee thereof, which information concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association ... shall be fined under this title, or imprisoned not more

sions to compel agency action or set aside agency actions in accordance with 5 U.S.C. § 706(1) and (2) resides in the United States District Courts. *See Martinez v. United States*, 333 F.3d 1295, 1313 (Fed.Cir.2003), ("the Court of Federal Claims lacks APA jurisdiction ...."), *cert. denied*, 540 U.S. 1177, 124 S.Ct. 1404, 158 L.Ed.2d 76

(2004); *Reilly v. United States*, 93 Fed.Cl. 643, 650 (2010) ("This court also lacks, for that matter, jurisdiction over these claims under the Administrative Procedures [sic] Act, 5 U.S.C. § 502, et seq., as jurisdiction over claims relying upon that statute lies solely in the district courts.") (footnote omitted).

than one year, or both; and shall be removed from office or employment.

18 U.S.C. § 1905.

 Initially, the court notes that the Trade Secrets Act in Title 18 of the United States Code is an entirely criminal statute. This court does have not jurisdiction to enforce criminal statutes; such jurisdiction is vested in the United States District Courts. *See Joshua v. United States,* 17 F.3d 378, 379 (Fed.Cir.1994); *Mendes v. United States,* 88 Fed.Cl. 759, 762 (2009) (finding that the court lacked jurisdiction to consider plaintiff's criminal claims), *appeal dismissed,* 375 Fed. Appx. 4 (Fed.Cir.2009); *McCullough v. United States,* 76 Fed.Cl. 1, 4 (2006) (similarly finding that the court lacked jurisdiction to consider plaintiff's criminal claims), *appeal dismissed,* 236 Fed.Appx. 615 (Fed.Cir.), *reh'g denied* (Fed.Cir.), *cert. denied,* 552 U.S. 1050, 128 S.Ct. 675, 169 L.Ed.2d 529 (2007).

Plaintiff's claims included in Counts I (Procurement Integrity Act), II (Trade Secrets Act), and V (Fifth Amendment Taking Claim) revolve around whether plaintiff's integrated equipment list and design layout of the Mobile Surgery Unit ™ are proprietary and whether or not they have been released into the public domain. Plaintiff asserts that the information at issue is proprietary because it constitutes a trade secret and that all trade secrets are proprietary. Although this court cannot review claims under 18 U.S.C. § 1905, the issue of whether the integrated equipment list and design layout are entitled to trade secret protection is relevant to other issues in the case, and is discussed below.

 "The first step in any trade secret analysis is a determination of whether any trade secrets exist." *Roton Barrier, Inc. v. Stanley Works,* 79 F.3d 1112, 1116 (Fed.Cir.), *reh'g denied* (Fed.Cir. 1996). Moreover, Federal Courts apply the appropriate Trade Secret law of the appropriate state. *See id.;* *see also Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.,* 587 F.3d 1339, 1355 (Fed.Cir.2009) ("We apply the trade secret law of the appropriate state...."), *reh'g and reh'g en banc denied* (Fed.Cir. 2010). The plaintiff urges the use of the state law of Vermont, MMIC's principal place of business. Plaintiff also points out that its state

of incorporation, Delaware, and Vermont both have enacted largely identical Trade Secrets Acts, both based on the Uniform Trade Secrets Act, 14 U.L.A. 437 (1990), which also has been adopted by a majority of states. *See Dicks v. Jensen,* 172 Vt. 43, 46, 768 A.2d 1279 (2001). In interpreting the Vermont Trade Secrets Act, the Vermont Supreme Court looked to the decisions of its sister states interpreting trade secret protection because in enacting the Vermont Trade Secrets Act, the Vermont Legislature intended that the act be "construed to effectuate its general purpose to make uniform the law ... among states enacting it." *Id.* (citing 9 V.S.A. § 4608 (2009)).

The Vermont Trade Secrets Act defines a trade secret as:

[I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that: (A) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (B) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

9 V.S.A. § 4601(3) (2009); *see also Dicks v. Jensen,* 172 Vt. at 47, 768 A.2d 1279 ("As indicated by the statutory definition of trade secret, there are two components to the test for whether some information deserves trade secret protection. The first is whether the information has independent economic value that is not readily ascertainable to others; the second is whether reasonable efforts were made to maintain the information's secrecy."). Thus, the Vermont Trade Secrets Act requires a two part inquiry determining, first, whether MMIC's integrated equipment list was readily ascertainable to others and, second, whether MMIC took reasonable efforts to maintain its secrecy.

 An early, basic tenet of trade secret law is that the material "must be secret, and must not be of public knowledge or of a general knowledge in the trade or business." *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 475, 94 S.Ct. 1879, 40 L.Ed.2d

315 (1974). As a general proposition and according to Comment to section 1 of the Uniform Trade Secrets Act, "[i]nformation is readily ascertainable if it is available in trade journals, reference books, or published materials. Often, the nature of a product lends itself to being readily copied as soon as it is available on the market." Uniform Trade Secrets Act § 1 cmt., 14 U.L.A. 437. Furthermore, obtaining alleged trade secrets from reverse-engineering (as long as the acquisition of the original product was proper), published literature, or public displays are acceptable means of acquiring the information. *Id.*; *see also Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. at 476, 94 S.Ct. 1879 ("A trade secret law, however, does not offer protection against discovery by fair and honest means, such as by independent invention, accidental disclosure, or by so-called reverse engineering....") (footnote omitted); *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir.2009) (citing *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. at 476, 94 S.Ct. 1879). By disclosing alleged trade secrets, the owner has relinquished the property interest in the information. As the United States Supreme Court explained:

> Because of the intangible nature of a trade secret, the extent of the property right therein is defined by the extent to which the owner of the secret protects his interest from disclosure to others. *See Harrington* [*v. National Outdoor Advertising Co.*, 355 Mo. 524, 532, 196 S.W.2d 786 (1946) ]; *Reddi–Wip* [*Inc. v. Lemay Valve Co.*, 354 S.W.2d 913, 917 (Mo.App.1962) ]; *Restatement of Torts* § 757 (1939); *see also Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 474–476, 94 S.Ct. 1879, 1882–1883, 40 L.Ed.2d 315 (1974). Information that is public knowledge or that is generally known in an industry cannot be a trade secret. Restatement of Torts § 757. If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished. *See Harrington* [*v. National Outdoor Advertising Co.*, 355 Mo. at 532, 196 S.W.2d 786];

1 R. Milgrim, *Trade Secrets* § 1.01[2] (1983).

*Ruckelshaus v. Monsanto*, 467 U.S. 986, 1002, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984); *see also Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 584, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985) ("As a matter of state law, property rights in a trade secret are extinguished when a company discloses its trade secret to persons not obligated to protect the confidentiality of the information."); *Southwest Stainless, LP v. Sappington*, 582 F.3d 1176, 1190 (10th Cir.2009) (citing *Ruckelshaus v. Monsanto*, 467 U.S. at 1002, 104 S.Ct. 2862); *Nova Chemicals, Inc. v. Sekisui Plastics Co., Ltd.*, 579 F.3d 319, 327 (3d Cir.2009); *Grayton v. United States*, 92 Fed. Cl. 327, 337 (2010); *Block v. United States*, 66 Fed.Cl. 68, 75 (2005); *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1052 n. 12 (Del.Super.Ct.2001) (for a trade secret to exist it must be " 'the subject of efforts that are reasonable under the circumstances to maintain its secrecy.' " (quoting 6 Del. C. § 2001(4) (2010))).

■■■■■ "A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Minn. Mining & Mfg. Co. v. Pribyl*, 259 F.3d 587, 595–96 (7th Cir.), *reh'g denied* (7th Cir. 2001) (interpreting the Wisconsin Uniform Trade Secrets Act). However, "[a] combination does not constitute a trade secret unless it transforms the individual features into something that is itself secret, i.e. not generally known or easily duplicated by the industry." *Fast Food Gourmet, Inc. v. Little Lady Foods, Inc.*, 542 F.Supp.2d 849, 863 (N.D.Ill.2008) (interpreting the Illinois Trade Secrets Act).

### *Plaintiff's Integrated Equipment List*

■■■■ Defendant asserts that plaintiff's integrated equipment list of vendors which could provide publicly offered equipment and the general description of the equipment was not proprietary. Moreover, defendant argues that the integrated equipment list did

not contain a confidentiality stamp.[29]

Plaintiff responds that despite the fact that the individual vendors and equipment described in the list provide public information on their products and are publicly identifiable, the list taken as a whole, which combines individually selected elements and was developed after many hours of hard work is not public information. Plaintiff claims that the proprietary value of the list is derived from the fact that plaintiff spent considerable time and money in winnowing down the list of potential suppliers to the few listed. Therefore, plaintiff seems not to claim a proprietary interest in the individual descriptions of the equipment in the list, but rather claims a proprietary interest in the list taken as a whole.

██ The Vermont Supreme Court has recognized that a customer list can be a trade secret, if time and money were expended to compile the information in the list. *See Dicks v. Jensen,* 172 Vt. at 47, 768 A.2d 1279. "But, the threshold amount of time and money that must be invested before a customer list is accorded statutory protection varies considerably." *Id.* (citing *Republic Sys. & Programming, Inc. v. Computer Assistance, Inc.,* 322 F.Supp. 619, 627 (D.Conn.1970) (list of software purchasers must result from years of business effort and advertising and expenditure of time and money to be protected), *aff'd,* 440 F.2d 996 (2d Cir.1971) and *Lincoln Towers Ins. Agency v. Farrell,* 99 Ill.App.3d 353, 54 Ill.Dec. 817, 425 N.E.2d 1034, 1038 (1981) (discussing cases in which customer lists have been protected because they have been developed over many years and at considerable expense)). There is no

bright line test as to when the threshold of time and energy invested has been reached to warrant trade secret protection. *See Dicks v. Jensen,* 172 Vt. at 49, 768 A.2d 1279. Courts have relied on case-specific information to determine whether a list is a protected trade secret. *See id.* at 48–49, 768 A.2d 1279.[30]

Regarding MMIC's integrated equipment list, plaintiff asserts that "[n]arrowing this list took years of research and design to overcome difficult challenges in finding equipment that is the right size, weight, and configuration while retaining necessary functionality to achieve the unit's goals of being self-contained and mobile while also compliant with all necessary codes and licensing requirements." As a result, plaintiff asserts the list is not readily ascertainable because "access to this list would save [a] competitor years of research and design by narrowing the universe of suitable products to a convenient list, sorted by make and model." However, as discussed in further detail below, plaintiff undermined any argument that the alleged research and development invested in its information warranted trade secret status when plaintiff displayed a fully-equipped model unit at numerous public trade shows. Thus, contrary to plaintiff's assertion, its integrated equipment list is readily ascertainable from merchants who advertise and sell to the public. Plaintiff chose to publicly display a model unit. Only the name Mobile Surgery Unit ™ was trademarked. Defendant does not contest that considerable time and money may have been spent in compiling the information in plaintiff's supplier list.

**29.** Only the Budgetary Proposal sent to the contracting officer during the consideration of a possible sole source contract, to which the integrated equipment list was attached, came with a disclaimer that all attachments were proprietary and confidential.

**30.** The *Dicks* court also compared *Town & Country House & Home Service, Inc. v. Newbery,* 3 N.Y.2d 554, 170 N.Y.S.2d 328, 147 N.E.2d 724 (1958), in which the court found that plaintiff's house cleaning customer list was a trade secret in that plaintiff narrowed the customers down to about a dozen after making hundreds of phone calls, *with Leo Silfen, Inc. v. Cream,* 29 N.Y.2d 387, 328 N.Y.S.2d 423, 278 N.E.2d 636 (1972), in which the court found that a list of custom-

er/businesses was not a trade secret because the businesses' names and addresses were readily ascertainable despite plaintiff spending a great deal of time and expense in narrowing down the list of prospective customer/businesses to a few. The *Leo Silfen* court distinguished its case from *Town & Country* because the house cleaner in the *Town & Country* case was trying to create a market for a new type of service. *Id.* at 394, 328 N.Y.S.2d 423, 278 N.E.2d 636. The *Dicks* court noted that there is a higher standard applied in cases when plaintiff's market is highly specialized or unique than in cases in which the market is "more pedestrian." *Dicks v. Jensen,* 172 Vt. at 49, 768 A.2d 1279.

Rather, defendant argues that the vendors and their equipment are publicly identifiable and the equipment is both publicly identifiable and publicly available. Moreover, defendant points out that "the vendors were logical vendors, familiar to those in the industry such as the contracting officer."

Defendant also contends that plaintiff is judicially estopped from claiming a proprietary interest in its design layout and equipment list because it "successfully urged [in other patent litigation] the position that the layout design of, and equipment used in, mobile operating rooms and mobile surgical vans is non-proprietary."[31] In the case before this court, however, plaintiff responds that its patent suit, contesting the patent for a general mobile surgical trailer, should not be construed as contesting the specific trade secrets it now seeks to protect.

As the United States Supreme Court explained in *Zedner v. United States*:

"[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *Davis v. Wakelee*, 156 U.S. 680, 689, 15 S.Ct. 555, 39 L.Ed. 578 (1895). This rule, known as judicial estoppel, "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Pegram v. Herdrich*, 530 U.S. 211, 227, n. 8, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000). *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001), *reh'g denied*, 533 U.S. 968 [122 S.Ct. 10, 150 L.Ed.2d 793] (2001).

Although this estoppel doctrine is equitable and thus cannot be reduced to a precise formula or test, "several factors typically inform the decision whether to apply the doctrine in a particular case: First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position.... A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.*, at 750–751, 121 S.Ct. 1808 (citations and internal quotation marks omitted).

*Zedner v. United States*, 547 U.S. 489, 504, 126 S.Ct. 1976, 164 L.Ed.2d 749 (2006).

■ Plaintiff's position in the patent suit is *not inconsistent with its position in this* case. In the patent suit, plaintiff maintained that another company, Advanced Mobile Hospital Systems, Inc., should not hold a patent to manufacture expandable mobile operating rooms because the concept of expandable mobile operating rooms was not unique and was commonly known. In the current case, plaintiff contends that the particular design of its Mobile Surgery Unit ™ design layout and its specific list of integrated equipment are proprietary information. Plaintiff argued in the patent suit that "[i]t would have been common knowledge that a surgery room, whether fixed or mobile, should be provided with essential equipment for conducting surgery," and that " 'commonly available and commercially acceptable' items would have been familiar design choices to those skilled in the art" of designing surgical trailers. However, there is no evidence that the particular Mobile Surgery Unit ™ design layout or the specific vendors, makes, and models listed in plaintiff's integrated equipment list appears in the patent litigation. Indeed, in the patent litigation, the equipment that plaintiff now concedes is commercially available and generally used in surgical rooms, includes: an anesthesia machine and monitors, crash resuscitation cart, surgical instrument table, autoclave for sterilizing, surgical monitoring equipment, patient lift, surgical spotlight, gas supply and pipes, suctional supply, sterile operating room table, nursing surveillance station, dressing facility, and surgical instruments. This list of

---

**31.** The referenced patent litigation is found at *Mobile Med. Int'l Corp. v. Advanced Mobile Hosp. Sys. Inc.*, No. 2:07–CV–231 (D.Vt.). The patent litigation in the United States District Court of Vermont, is currently stayed.

equipment, aside from a general surgical light, is dissimilar to more specific equipment described in this litigation: "dual head" surgical light, x-ray illuminator, pre-vacuum steam sterilizer, ultrasonic cleaner, modular cabinetry system, and low temperature sterile processing system.

Likewise, the design layouts described and provided in the patent litigation differ from plaintiff's design layout at issue in this case. The Mobile Hospital floor plan described in the patent case included: plumbing equipment, an examination room, x-ray unit, scale, resuscitator unit, instrument case, oxygen outlet, leaded dividing wall, waiting room, dark room, bathroom, laboratory and sterilization room, operating room, anesthesia machine, and lights. Another floor plan described in the patent litigation included: recovery and pre-op rooms, clean and soiled work rooms, changing areas, a waiting room, and an area to conduct business functions. In contrast, plaintiff's floor plan in the current litigation includes several dividing walls, a double scrub sink, an operating room, a combined pre-op and recovery room, a bathroom, a soiled and clean utility room with sterilizer, a nurse's station, four patient care stations, a double door in the soiled utility room, and bathroom. The equipment listed in the first floor plan in the patent litigation is not included in MMIC's layout and the second floor plan described in the patent litigation omits several elements included in MMIC's layout. Moreover, the design layouts in the patent suit are dissimilar to MMIC's layout included in plaintiff's proposal to the Agency. The only layouts of trailers reproduced from the patent litigation are not expandable, and they include several smaller rooms of dimensions dramatically different from plaintiff's rooms at issue in this litigation. Consequently, the court finds that plaintiff's position in the prior patent litigation is not inconsistent with plaintiff's argument in the current case and, therefore, judicial estoppel is not applicable.

Nevertheless, MMIC integrated equipment list was readily ascertainable because plaintiff had displayed a fully-equipped model unit, and educated observers could recreate plaintiff's integrated equipment list by viewing the model unit. Plaintiff argues that viewing a model unit would not advise an observer of the detail that could be found in the integrated equipment list. However, an observer could compose a list of the equipment in the model unit by determining the make and model imprinted on the individual item and contacting the suppliers. Indeed, all of the equipment on the list appears to be readily observable in a model unit, as none of the equipment was of the type hidden in a floor or in the walls. Furthermore, the brand name of at least one item, the Dual Head Surgical Light, is easily legible even in the grainy black and white 3″ photograph provided as an exhibit to the court.

Plaintiff is correct in noting that an observer could not determine the heat to light ratio of the dual head surgical light or other such specific descriptive information in the list. However, were an observer to take note of the equipment, especially the make and model, the observer could uncover the descriptive information of the equipment, as it is publicly available. It was possible to recreate the list, even though plaintiff claims the elements of the list are highly protected and not easily ascertainable. In fact, the government was able to locate much of the equipment and most of the descriptive information for that equipment on plaintiff's list online. Moreover, given that the plaintiff included a disclaimer on its equipment list, that the "[b]rand and/or [m]odels may be substituted with equivalents without notice," an observer need only identify the equipment generally and research an equivalent brand or model to recreate a list within the scope of plaintiff's list, having the same type of equipment in the same order, albeit using a different brand or model. Indeed, the surgical light in one photograph of plaintiff's surgery room, is a Chromophare D530 plus, whereas the light listed in plaintiff's equipment list is a Nuvo V1350D and V1360A.

Plaintiff contends that a company should be able to display a manufactured product at a trade show without worrying that it has disclosed trade secrets. Plaintiff acknowledges that, "[i]f the company reveals the trade secret, however, its value is lost

and the company may not enjoin its use." Although plaintiff may object to losing the alleged trade secret status of its mobile surgical unit, when it put on display the proportional, internal elements of its fully-integrated model unit of MMIC's expandable Mobile Surgery Unit,™ plaintiff revealed not just how to design and equip an expandable mobile surgical unit, but also how to design and equip plaintiff's mobile surgical unit. Thus, the layout and equipment list were no longer secret.

In addition, the equipment included in the list appears neither unique nor illogical for inclusion in a standard surgery room, such that having the equipment list would provide plaintiff with a unique product, and the only product which could meet the Agency's needs. In its patent suit, plaintiff noted that essential equipment for a surgery room would include surgical lights and a sterilizer. Even a lay person (or contractor) could conclude that a surgical room would require a surgical light, cabinetry, an x-ray light box, and a means of sterilizing and cleaning equipment. Although plaintiff contends that the cabinetry system was unique because it worked with the manufacturer to custom develop a three drawer system of specific depths, plaintiff also acknowledged that the system was developed from a standard operating room so that surgical staff would feel as comfortable in the trailer as in a "normal ambulatory surgical center." Plaintiff also contends that its cabinetry was designed to account for collapsing floors and swing wall partitions, however, the Herman Miller cabinetry identified in the equipment list is merely described as rail mounted and, for example, lists the number of countertops and trays used. Any reasonable manufacturer building a room with cabinets in an expanding trailer would realize that, depending upon the location of the cabinets, one would have to account for the sliding floors. Furthermore, the ultrasonic cleaner featured in the equipment list does not detail the relocation of switches, plumbing, and indicator lights that plaintiff claims makes it special. Assessing the description of the Nuvo surgical light in the equipment list reveals that there is no description of its mounting, wiring, or other special provisions that plaintiff claims sets it apart. Additionally, plaintiff noted in its patent suit that stowable surgical lights have been used before in a Mobile Field Hospital, and that it is only logical that a surgical light would have to be stowable to accommodate the expanding sides of a trailer.

Moreover, plaintiff's equipment list is composed of a small number of items. Were the list to include forty to fifty items, or perhaps even twenty to thirty items, and were the items organized in a manner that suggested that they worked together in a specific way, plaintiff might have a better argument on the unique nature of its product. However, the limited number of items on plaintiff's equipment list is organized logically, by room, and there is no indication as to how the items might interact. Nor does it appear that the items do, or can, interact. As such, no competitor would gain a significant advantage from seeing a general, short list of logical surgical room equipment, listed in no particular order.

Also, plaintiff admits that it developed its equipment list by visiting various surgical rooms in hospitals. It follows, therefore, that the limited number of pieces of equipment on the list are not unique, illogical, unusual or special, but, in fact, are standard pieces of equipment used in hospital surgical rooms. Although the equipment may have been modified to make it more useful in a mobile setting, the equipment list does not, and plaintiff has not shown how the equipment list would reveal such modifications. Plaintiff has not demonstrated that the modifications are so unusual that they could not have been discovered by a professional in the field, and the modified items are available for purchase by the public.[32] In fact, the length of the rails described in the equipment list could enable a skilled competitor to exactly configure its operating room to mimic plaintiff's and could do so by visiting any one of

---

**32.** Moreover, although plaintiff argued that modified items were not available on the distributors' website, at least one of the modified items, the Nouveau Dill overhead surgical lights, was located by defendant's counsel on the internet.

the trade shows in which plaintiff displayed a fully-integrated model unit.

The second question regarding whether plaintiff should be able to claim trade secret protection requires a determination of whether plaintiff took reasonable efforts to maintain the secrecy of its equipment list. *See, e.g.,* 9 V.S.A. § 4601(3).

> Other jurisdictions have used several factors to determine the reasonableness of efforts to maintain the information's secrecy, including whether parties had a written agreement not to compete, *Zoecon Industries, a Division of Zoecon Corp. v. American Stockman Tag Co.,* 713 F.2d 1174, 1178 (5th Cir.1983), whether knowledge was confined to any restricted group of employees, *Jet Spray Cooler Inc., v. Crampton,* 361 Mass. 835, 842 [282 N.E.2d 921] (1972), and the extent of measures to guard access to the information, *Augat, Inc. v. Aegis, Inc.,* 409 Mass. 165, 169–170 [565 N.E.2d 415] (1991).

*Dicks v. Jensen,* 172 Vt. at 50, 768 A.2d 1279. The above factors were suggested by the court as exemplary, leaving open the opportunity for courts to consider other relevant factors.

Plaintiff argues it never sold its allegedly secret information, has licensed its allegedly secret information only under strict contractual agreement, requires employees and visitors to sign confidentiality agreements, restricts access to its computers with passwords, restricts access to its offices with coded badges, and has twenty-four hour security with patrolling guards. In this regard, plaintiff asserts, and defendant does not contest, that MMIC limits access to its office with a key card system, has different levels of visitor access compliant with government contracts and International Traffic in Arms regulations, is a top secret/secret facility, compartmentalizes its offices and computer systems to limit access to employees with specific security clearances, screens its employees' work through multi-

ple levels of review before the work is distributed to potential customers, encrypts emails containing confidential or proprietary information with a security password, includes a notice that confidential and proprietary information is included in relevant emails, and stamps some documents as confidential and proprietary.

The court finds, however, although plaintiff may have taken some measures to maintain the secrecy of its trade information, plaintiff's assertions of confidentiality and the steps taken to protect its information were wholly undermined by its publicly displaying a model unit. The court concludes that plaintiff's integrated equipment list was not in the category of a trade secret. Not only is the equipment list not a trade secret, nor is it proprietary. "Proprietary information" is defined as "[i]nformation in which the owner has a protectable interest." *Black's Law Dictionary* 1339 (9th ed. 2009). Inherent in the definition is that information is not proprietary if it is not protected. Once the information is released into the public domain, the owner has lost its ability to protect its interest from others. Because plaintiff publicly displayed the equipment from its list in a fully-integrated model unit on several occasions, plaintiff lost any proprietary interest in the integrated equipment list.

*Plaintiff's Mobile Surgery Unit* ™

■ Similarly, plaintiff's Mobile Surgery Unit ™ design layout is not entitled to trade secret protection because it was made public and, therefore, readily ascertainable and not maintained as a secret through reasonable effort by the plaintiff. Defendant contends that plaintiff's Mobile Surgery Unit ™ design layout was not a secret because plaintiff openly displayed a model unit, plaintiff handed out brochures [33] and presented a slideshow, without confidentiality markings, to the public, which included the design layout. In addition the design layout was released in a public solicitation without previous litigation on the part of the plaintiff.[34] To these asser-

---

**33.** Plaintiff is correct that the brochure alone could not have enabled the contracting officer to reproduce the design layout, because certain designs on the RFQ are not evident in the bro-

chure. For example, there are no doors shown on the brochure unlike on the RFQ design.

**34.** Defendant refers to the solicitation "issued pursuant to a HubZone set-aside lease between

tions plaintiff, incorrectly, insists that elements of the drawing design layout could not be viewed at a site visit with the display model.[35] Although plaintiff concedes that the brochure, slideshow, and solicitation drawing were publicly available, the plaintiff insists that the contracting officer had a duty to inquire about the drawing before reproducing it under FAR 3.104–4, "Disclosure, protection, and marking of contractor bid or proposal information and source selection information" (2009).[36]

Plaintiff's argument that the slideshow and solicitation drawing, which would have enabled the contracting officer to reproduce the design layout, were published without permission by a third party, is unpersuasive. In this case, plaintiff never explicitly demanded that the slideshow and solicitation drawing be kept confidential, relying instead on personal "expectations" and "impressions" that the slideshow and solicitation drawing would be held in confidence.

Finally, plaintiff's arguments as to FAR 3.104–4 are not persuasive. FAR 3.104–4(d) provides that: "Except as provided in paragraph (d)(3) of this subsection, the contracting officer must notify the contractor in writing if the contracting officer believes that proprietary information, contractor bid or proposal information, or information marked in accordance with [FAR] 52.215–1(e) has been inappropriately marked." Plaintiff did not individually mark its brochure, slideshow, model unit, or solicitation drawing as confidential or proprietary. Thus, these items were not inappropriately marked under FAR 3.104–4, and no duty on the part of the contracting officer arose. Furthermore, a closer reading of FAR 3.104–4 reveals an intention to prevent contractors from marking information which is not confidential as confidential. The relevant language of FAR 3.104–4(d) provides that a contractor shall have the opportunity to justify the marking and:

(1) If the contractor agrees that the marking is not justified, or does not respond within the time specified in the notice, the contracting officer may remove the marking and release the information.

(2) If, after reviewing the contractor's justification, the contracting officer determines that the marking is not justified, the contracting officer must notify the contractor in writing before releasing the information.

(3) For technical data marked as proprietary by a contractor, the contracting officer must follow the procedures in 27.404–5.

FAR 3.104–4(d).

■■■ In summary, because plaintiff distributed or permitted the public display of its design layout, the design layout was readily ascertainable and plaintiff did not take reasonable efforts to maintain its secrecy. Therefore, the court finds, for the purposes of this bid protest, that plaintiff's Mobile Surgery Unit ™ layout is not a trade secret or proprietary. Moreover, even if the design layout had been proprietary, plaintiff has not established it was prejudiced by its release.

First, the winning bidder, Gerling, submitted a design layout dissimilar to plaintiff's design layout and, thus, gained no obvious competitive advantage from seeing plaintiff's layout. The layout Gerling submitted in response to the RFQ was found technically acceptable by the Agency, although it was subsequently modified. Gerling's layout had

---

the Martinsburg, West Virginia VA Medical Center and MMIC," in which a drawing was provided by the plaintiff. Plaintiff suggests that the Martinsburg, West Virginia, VA published the solicitation drawing.

**35.** Certain elements which plaintiff cites as being visible on the design layout drawing, but not in a display model are, in fact, not visible on the design layout drawing. For example, [deleted]. Neither is there any explanation as to how a competitor could reverse engineer a bi-fold floor design from the design layout which shows no markings on the floor, but plaintiff does not

explain why this would not be evident in a model unit. A double scrub sink and a hand-washing sink also would be viewable in a model unit. Plaintiff further claims that the double doors in the utility room would be evident in the drawing but not in a display model, a notion that plaintiff also does not explain, and which seems illogical.

**36.** Furthermore, plaintiff's design layout is distinct from the RFQ drawing because the RFQ drawing shows three doors in the soiled utility room, whereas plaintiff's design layout shows only two.

a bathroom located in the center of the trailer; plaintiff's bathroom was twice as large as Gerling's bathroom and was in the back end of the trailer. Gerling's design showed [deleted] in the center of the operating room; plaintiff's design did not. Gerling's layout had one set of stairs, and its [deleted] were open to the recovery area; plaintiff's design showed [deleted] at the front end of the trailer, off the surgical suite. Gerling's trailer had only [deleted] of interior doors and [deleted] rooms ( [deleted] ). In contrast, plaintiff's design layout had [deleted] interior doors and [deleted] rooms ( [deleted] ).

Second, Gerling's final submission was similar to the layout it submitted in response to the Agency's RFI, which was released before the alleged disclosure of plaintiff's design layout, indicating Gerling was not influenced by the RFQ drawing. Gerling's RFI layout was in a [deleted] with [deleted] rooms and [deleted] utility rooms. There was a [deleted] surgical area in the [deleted] of the trailer, with surgical overhead lights, and an area for recovery in a non-expanding part of the trailer, where [deleted] rooms were located. One of the [deleted] rooms had an [deleted] which plaintiff claims was unique to its trailer. This [deleted] does not appear in Gerling's RFQ layout, which was submitted after the alleged disclosure of plaintiff's drawing. Although not entirely similar to Gerling's RFQ drawing, Gerling's RFI drawing is much more similar to its RFQ drawing than plaintiff's design layout and, indeed, could not have been based on plaintiff's layout because it was submitted prior to the alleged disclosure. The key change from Gerling's RFI drawing to its RFQ drawing was to provide the [deleted] which concededly, is similar to plaintiff's drawing in that the respective [deleted]. Given the various other dissimilarities between the two designs, however, this one similarity is not sufficient proof of influence.

Third, both of Gerling's design layouts were similar to plaintiff's competitor's design layout, whose patent had expired before the current controversy arose. The drawing in the patent suit was a T-shaped trailer with a surgical room, with overhead lights, in the expanding section of the trailer, and an area for recovery in the non-expanding section of the trailer. The general layout of the patent suit drawing is nearly identical to Gerling's RFI drawing and differs from Gerling's RFQ drawing in that the [deleted] room in the RFQ drawing has [deleted]. The similarities between the patent suit drawing and Gerling's drawings suggest that Gerling's designs may not have been based on plaintiff's designs and that Gerling's design was a logical manner in which to lay out a surgery room.

Fourth, Gerling did have to modify its trailer by moving the [deleted] rooms [deleted], similar to plaintiff's design layout. However, Gerling made the adjustment pursuant to VA regulations and workflow needs, not necessarily because of plaintiff's layout. In both of Gerling's original drawings, the [deleted] were located in the [deleted] area, unlike plaintiff's [deleted], which were located in the [deleted].

Fifth, any contractor could have reproduced plaintiff's design layout by viewing a model unit or slideshow presentation at any one of the trade shows at which it was displayed, or by examining a brochure which plaintiff distributed. Thus, not only was plaintiff not prejudiced because Gerling did not use its design, but also plaintiff was not prejudiced because it provided its competition with its allegedly secret design. Plaintiff cannot demonstrate it had a substantial chance of winning the award had the Agency not released its design layout because any one of its competitors could have submitted a bid with the same or similar design and been more competitive in other significant ways, such as price. Moreover, as was evident with Gerling's design layout, plaintiff's exact design layout was not necessary to win the contract. As such, there is no reason to believe that, but for the release of plaintiff's design layout, MMIC would have had a substantial chance of winning the contract. For the reasons discussed above, plaintiff was not prejudiced by release of its design layout.

*Fifth Amendment Taking Clause*

 Plaintiff also argues that the disclosure and use of its proprietary data implicates the Taking Clause. The Fifth Amendment provides that "private property [shall

not] be taken for public use, without just compensation." U.S. Const. amend. V. The Fifth Amendment is intended "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960); *see also 767 Third Ave. Assocs. v. United States,* 48 F.3d 1575, 1580 (Fed.Cir. 1995) (citing *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 123, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) and *Florida Rock Indus., Inc. v. United States,* 18 F.3d 1560, 1571 (Fed.Cir.1994), *cert. denied,* 513 U.S. 1109, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995)). Trade secrets are protected as property interests under the Fifth Amendment Taking Clause. *See Ruckelshaus v. Monsanto Co.,* 467 U.S. at 1003–04, 104 S.Ct. 2862; *see also 767 Third Ave. Assocs. v. United States,* 48 F.3d at 1578 n. 2 (citing *Ruckelshaus v. Monsanto Co.,* 467 U.S. at 1003–04, 104 S.Ct. 2862, for the idea that trade secrets may be "property" under Taking Clause); *Yancey v. United States,* 915 F.2d 1534, 1540–41 (Fed.Cir.1990), *reh'g denied* (Fed.Cir.), *en banc suggestion declined* (Fed.Cir. 1991).

[32] The defendant concedes that if the court finds the Agency improperly distributed plaintiff's trade secrets to its competitors, the court would have jurisdiction over plaintiff's taking claim. However, property rights in trade secrets that otherwise come within the scope of the Fifth Amendment are extinguished if the secret information is released to the public. *See Ruckelshaus v. Monsanto Co.,* 467 U.S. at 1002, 104 S.Ct. 2862. Plaintiff insists that its equipment list and design layout are protected under the Fifth Amendment as trade secrets. Because the court finds that plaintiff's integrated equipment list and Mobile Surgery Unit ™ design layout are publicly available, they are not trade secrets and, thus, are not protected under the Fifth Amendment. Therefore, Count V of the plaintiff's complaint is dismissed.

### *Injunctive Relief*

■ Plaintiff requested both preliminary and permanent injunctive relief. To obtain a temporary restraining order or preliminary injunction, the plaintiff must carry the burden of establishing entitlement to extraordinary relief based on the following factors: (1) likelihood of success on the merits of the underlying litigation, (2) whether irreparable harm is likely if the injunction is not granted, (3) the balance of hardships as between the litigants, and (4) factors of the public interest. *See Abbott Labs. v. Sandoz, Inc.,* 544 F.3d 1341, 1344 (Fed.Cir.2008) (citing *Oakley, Inc. v. Sunglass Hut Int'l,* 316 F.3d 1331, 1338–39 (Fed.Cir.2003)), *reh'g and reh'g en banc denied* (Fed.Cir. 2009); *see also Pharm. Research and Mfrs. of Am. v. Walsh,* 538 U.S. 644, 670, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003) (requiring a movant for preliminary injunction to prove that the "probability of success on the merits of its claims ... the risk of irreparable harm, the balance of the equities, and the public interest" weigh in the movant's favor); *Somerset Pharms., Inc. v. Dudas,* 500 F.3d 1344, 1346 (Fed.Cir.2007) ("To establish entitlement to a preliminary injunction a movant must establish a reasonable likelihood of success on the merits." (citing *Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.,* 357 F.3d 1319, 1325 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir. 2004))); *U.S. Ass'n of Imps. of Textiles and Apparel v. U.S. Dep't of Commerce,* 413 F.3d 1344, 1346 (Fed.Cir.2005) (citing *Zenith Radio Corp. v. United States,* 710 F.2d 806, 809 (Fed.Cir.1983)).

■ The test for a permanent injunction is almost identical to that for a temporary restraining order or preliminary injunction, but rather than the likelihood of success on the merits, a permanent injunction requires actual success on the merits. *See Centech Group, Inc. v. United States,* 554 F.3d at 1037; *Amoco Prod. Co. v. Vill. of Gambell, Alaska,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) (holding that the standard for permanent injunction is the same as that for preliminary injunction, with the one exception being that the plaintiff must show actual success on the merits, rather than likelihood of success). In *PGBA, LLC v. United States,* the Federal Circuit set out the test for a permanent injunction, stating that a court must consider: (1) whether,

as it must, the plaintiff has succeeded on the merits of the case, (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) whether it is in the public interest to grant injunctive relief. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed.Cir.2004) (citing *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. at 546 n. 12, 107 S.Ct. 1396); *see also Nat'l Steel Car, Ltd. v. Canadian Pacific Ry., Ltd.*, 357 F.3d at 1325 (finding that a plaintiff who cannot demonstrate actual success on the merits cannot prevail on its motion for permanent injunctive relief); *Global Computer Enters., Inc. v. United States*, 88 Fed.Cl. 350, 403, *opinion modified*, 88 Fed.Cl. 466 (2009) (" 'The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.' " (quoting *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. at 546 n. 12, 107 S.Ct. 1396)); *PHT Supply Corp. v. United States*, 71 Fed.Cl. at 12; *Int'l Res. Recovery, Inc. v. United States*, 64 Fed.Cl. 150, 159 (2005); *Hunt Bldg. Co. v. United States*, 61 Fed.Cl. 243, 279, *opinion modified*, 63 Fed.Cl. 141 (2004); *Bean Stuyvesant,*

*L.L.C. v. United States*, 48 Fed.Cl. 303, 320–21 (2000) (citing *Hawpe Constr., Inc. v. United States*, 46 Fed.Cl. 571, 582 (2000), *aff'd*, 10 Fed.Appx. 957 (Fed.Cir.2001)). In this case, plaintiff, as discussed above, fails on multiple grounds to meet the test for injunctive relief, including lacking standing to bring this bid protest and inability to demonstrate likelihood of success on the merits of its claims.

## CONCLUSION

For the foregoing reasons, plaintiff does not have standing to bring the claims alleged against the Department of Veterans Affairs, Southeast Louisiana Veterans Health Care Systems or the General Services Administration for arbitrary and capricious agency action (Counts III–IV of the complaint), or against the Department of Veterans Affairs, Southeast Louisiana Veterans Health Care Systems for violations of the Procurement Integrity Act (Count I) or the Trade Secrets Act (Count II). Plaintiff's Fifth Amendment taking claim (Count V), is dismissed on the merits because the information plaintiff contends was protected was in the public domain at the time of the procurement activity. Therefore, plaintiff's complaint is dismissed in its entirety, with prejudice. The Clerk of the Court shall enter judgment in accordance with this opinion.

**IT IS SO ORDERED.**

744

## EXHIBIT A

MMIC's Mobile Surgery Unit.™

*Mobile Surgery Unit™ Floor Plan*

**EXHIBIT B**

MMIC's List of Integrated Equipment.

**Mobile Surgery Unit™ – Integrated Equipment**
Brands and/or Models may be substituted with equivalents without notice

MMIC
Mobile Medical

PO Box 572
St. Johnsbury, VT 05819
Tel: (802) 748.2372
Email: mmic@mobile-medical.com
http://www.mobile-medical.com

**MSU – Operating Room**

**(1) Dual Head Surgical Light**
* Superior performance for all aspects of surgery. The lightheads provide excellent shadow reduction, a high intensity light pattern and optimal color rendition by delivering an intensity of 137,000 lux
* Color temperature 4,300°K
* Pattern Size: 5.5 – 10 inches (14cm – 25cm) per lighthead
* Uses two tungsten quartz xenon/halogen bulb (Primary and Automatic Backup)
* A depth of field of 28-inches (70 cm) and >95% cavity penetration
* Heat to light ratio of 3.71 µW/cm²/Fc
* Spare bulb storage to facility fast replacement
* 180 Watts per lighthead (360 Watts total)

Manufacturer: Nuvo
Model: V1350D & V1350A

**(1) Double Panel X-Ray Illuminator**
* Plastic film holder grips film securely without damage
* Rocker on/off switch
* Two 15 watt fluorescent daylight bulbs
* Depth of 4" (10cm) adapts to either surface or recess mount option
* UL listed and CSL certified

Manufacturer: Burton Medical
Model: 0250020

**MSU – Clean Utility Room**

**(1) Pre-Vacuum Full Steam Sterilizer**
* Equipped with pre-vacuum, gravity, flash, express, leak test and daily air removal test cycles
* Touch screen with 30-line x 40-character display area
* Ink-on-paper impact printer
* Standard communication interface with most PC compatible peripheral devices (e.g. disk drives, printers)
* Automatic check of control program and cycle data maintains process integrity
* Vertical sliding door with hands-free loading and unloading capability
* Modularized vessel and piping for increased dependability and reduced serving time

Manufacturer: Steris
Model: Amsco Century V-116

Page 14 of 28

PO Box 672
St. Johnsbury, VT 05819
Tel: (802) 748.2322
Email: mmic@mobile-medical.com
http://www.mobile-medical.com

## MSU – Soiled Utility Room

**(1) Ultrasonic Cleaner**

- Equipped with pre-vacuum, gravity, flash, express, leak test and daily air removal test cycles
- Touch screen with 30-line x 40-character display area
- Ink-on-paper impact printer
- Standard communication interface with most PC compatible peripheral devices (e.g. disk drives, printers)
- Automatic check of control program and cycle data maintains process integrity
- Vertical sliding door with hands-free loading and unloading capability
- Modularized vessel and piping for increased dependability and reduced serving time
- Includes stainless cover
- 19 x 11.5 x 8 with 7.5 gallon capacity

Manufacturer: Sonicor
Model: SC-401T

## Pre-/Post-Operative Area / Operating Room / Clean Utility Room

**(1) Modular Cabinetry System**

- Rail-mounted cabinetry
- Standard Cabinetry Configuration includes:

 85 C-Frames
 20 Countertops
 27 Lids
 8 Trays
 654 Rails (measured in feet)
 73 Drawers 3"
 43 Drawers 6"
 30 Drawers 9"
 1 Desk configuration per OR Suite

Manufacturer: Herman Miller
Model: As Described Above

### Mobile Endoscopy Unit(™ - Integrated Equipment
### Brands and/or Models may be substituted without notice

**MMIC**
PO Box 872
St. Johnsbury, VT 05819
Tel: (802) 748 2322
Email: mmic@mobile-medical.com
http://www.mobile-medical.com

## MEU – Procedure Room 1 (Roadside)

**(1) Double Panel X-Ray Illuminator**
- Plastic film holder grips film securely without damage
- Rocker on/off switch
- Two 15 watt fluorescent daylight bulbs
- Depth of 4" (10cm) adapts to either surface or recess mount option
- UL listed and CSL certified

Manufacturer: Burton Medical
Model: 0250020

## MSU – Clean Utility Room

**(2) Low Temperature Sterile Processing System**
- Less than 30 minute standard cycle
- Low temperature sterile processing. 50°C - 56°C (122°F – 132.6°F)
- Proven materials compatibility
- Safe, non-toxic Steris process
- Automated, micro-processor controlled cycle
- Unattended operation
- Sterilized, not disinfected
- Dual line digital display
- Printer provides improved Q/A with permanent record cycle and increased efficiency with automated take-up reel

Manufacturer: Steris
Model: System 1D

## Pre-/Post-Operative Area / Procedures Rooms / Clean Utility Room

**(1) Modular Cabinetry System**

- Rail-mounted cabinetry
- Standard Cabinetry Configuration includes:

 34 Lids
 2 Trays
 62 Drawers 3"
 18 Drawers 6"
 24 Drawers 9"

Manufacturer: Herman Miller
Model: As Described Above

## EXHIBIT C

The Agency's Rendering of the Proposed
Mobile Medical Trailer.

**EXHIBIT D**

Drawings Allegedly Provided by
MMIC at Florida Event.

## Mobile Surgery Unit™

750

Drawing Allegedly Issued Pursuant
to Lease with MMIC.

EXHIBIT F

The Agency's List of Integrated
Equipment.

### Mobile Operating Room Equipment

Dual Head Surgical Light (**Brand Name or Equal**)

Nuvo V1350D & V1360A

- Superior Performance for all aspects of surgery. The lightheads provide excellent shadow reduction, a high intensity of light pattern and optimal color rendition by delivering an intensity of 137,000 lux
- Color Temperature 4,300K
- Pattern Size: 5.5–10 inches (14cm–25cm) per lighthead
- Uses two tungsten quartx xenon/halogen bulb (primary and Automatic Backup)
- A depth of field of 28–inches (70cm) and >95% cavity penetration
- Heat to light ratio of 3.71uW/cm2/Fc
- Spare bulb storage to facility fast replacement
- 180 Watts per lighthead (360 Watts total)

Double Panel X–Ray Illuminator (**Brand Name or Equal**)

Burton Medical 0250020

- Plastic film holder grips film securely without damage
- Rocker on/off switch

- Two 15 watt fluorescent daylight bulbs
- Depth of 4″ (10cm) adapts to either surface or recess mount option
- UL listed and CSL certified

### Clean Utility Room

Pre–Vacuum Full Steam Sterilizer (**Brand Name or Equal**)

Steris Amsco Century V–116

- Equipped with pre-vacuum, gravity, flash, express, leak test and daily air removal test cycles
- Touch screen with 30–line × 40–character display area
- Ink-on-paper impact printer
- Standard communication interface with most PC compatible peripheral devices (e.g. disk drives, printers)
- Automatic check of control program and cycle data maintains process integrity
- Vertical sliding door with hands-free loading and unloading capability
- Modularized vessel and piping for increased dependability and reduced serving time

### Soiled Utility Room

Ultrasonic Cleaner (**Brand Name or Equal**)

Sonicor SC–401T

- Equipped with pre-vacuum, gravity, flash, express, leak test and daily air removal test cycles
- Touch screen with 30–line × 40–character display area
- Ink-on-paper impact printer
- Standard communication interface with most PC compatible peripheral devices (e.g. disk drives, printers)
- Automatic check of control program and cycle data maintains process integrity
- Vertical sliding door with hands-free loading and unloading capability
- Modularized vessel and piping for increased dependability and reduced serving time
- Includes stainless cover

*Pre–Post–Operative Area/Procedure Rooms/Clean Utility Room*

Modular Cabinetry System (**Brand Name or Equal**)

Herman Miller
- Rail–Mounted cabinetry
- Standard Cabinetry Configuration Includes:
- 85 C–Frames
- 20 Countertops
- 27 Lids
- 8 Trays
- 254 Rails (measured in feet)
- 73 Drawers 3″
- 43 Drawers 6″
- 30 Drawers 9″
- 1 Desk Configuration per Operating Room Suite

*Mobile Procedure Room Trailer Equipment*

Double Panel X–Ray Illuminator (Brand Name or Equal)

Burton Medical 0250020
- Plastic film holder grips film securely without damage
- Rocker on/off switch
- Two 15 watt fluorescent daylight bulbs

- Depth of 4″ (10cm) adapts to either surface or recess mount option
- UL listed and CSL certified

*Clean Utility Room*

Low Temperature Sterile Processing System (**Brand Name or Equal**)

Steris System I®
- Less than 30 minutes standard cycle
- Low Temperature sterile processing 50c–56c (122F–132.8F)
- Proven materials compatibility
- Safe, non-toxic Steris process
- Automated, micro-processor controlled cycle
- Unattended operation
- Sterilized, not disinfected
- Dual line digital display
- Printer provides improved Q/A with permanent record cycle and increased efficiency with automated take-up reel

*Pre–Post–Operative Area/Procedure Rooms/Clean Utility Room*

Modular Cabinetry System (**Brand Name or Equal**)

Herman Miller
- Rail–Mounted cabinetry
- Standard Cabinetry Configuration Includes:
- 35 Lids
- 2 Trays
- 62 Drawers 3″
- 18 Drawers 6″
- 24 Drawers 9″

## EXHIBIT G

Gerling's List of Integrated Equipment.

### 7.2 Trailer Room Designation

### 1. Operating Room Trailer

© 2009 Gerling & Associates, Inc.

CITADELMOBILE OPERATION/PROCEDURE GA53–102ORPR
- A total of (3) three **Operating Room Trailers** shall be provided. Each trailer shall have 945 sq. ft of interior space and consist of the following requirements in

addition to the specifications noted throughout the body of this document as specified by VA requirements. Operating Room shall have 403.8 sq. ft

A. Operating Room with pre/post op recovery area for three patients as specified in VA requirements.

B. Nurse's Call System as specified in VA requirements.

C. Clean utility room including sink designed to maintain proper sterilization of instruments as specified in VA requirements.

D. Soiled utility room including sink as specified in VA requirements.

E. Integrated medical gases zoned for activation with required shut off valves as specified in VA requirements.

F. Nuvo dual surgical light as specified in VA requirements.

G. Burton Medical double panel x-ray illuminator as specified by VA requirements

H. Steris Amsco pre-vacuum steam sterilizer as specified by VA requirements

I. Tuttnauer ultrasonic cleaner as specified by VA requirements

J. Equipment and utility connections to provide mop sink, nurse's station sink, scrub sink, bathroom sink, soiled utility room sink, clean utility room sink, and sterilizer as specified in VA requirements.

K. Medical gas system with outlets for oxygen, nitrogen, medical air, nitrous oxide, and vacuum in both the OR and each patient care station as specified in VA requirements.

L. Anesthesia station with medical gas outlets for oxygen, nitrogen, medical air, nitrous oxide, and vacuum, and nurse call kick plate, regular and emergency power outlets, IV hooks, HVAC controls, lighting controls, code blue clock, and data and communication ports as specified in VA requirements.

M. Restroom as specified in VA requirements.

N. Herman Miller cabinetry as specified in VA requirements.

## EXHIBIT H

Gerling's Rendering of the Proposed Mobile Medical Trailer.

[deleted]